# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **CHRISTINA CHAO,** )<br>    **Plaintiff,** )<br> )<br>    **v.** )<br> )<br>**MOISES BALLISTA; KATHLEEN M. DENNEHY,** )<br>**Commissioner of the Massachusetts Department of** )<br>**Corrections; KELLEY RYAN, Superintendent South** )<br>**Middlesex Correctional Facility; RANDY AZZATO,** )<br>**Director of Security, South Middlesex Correctional** )<br>**Facility; CHRIS TORTORA, Training Officer, South** )<br>**Middlesex Correctional Facility; and MASSACHUSETTS** )<br>**DEPARTMENT OF CORRECTION,** )<br>    **Defendants.** ) | **C.A. No. 07cv10934-NG** |

**GERTNER, D.J.:**

## AMENDED

## MEMORANDUM AND ORDER RE:
## DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
### March 25, 2011

**This Memorandum replaces the version issued on March 18, 2011, only in that typographical errors have been corrected.**

Plaintiff Christina Chao ("Chao") brings this 42 U.S.C. § 1983 action against various defendants for damages arising out of a long-term sexual relationship with a prison guard during the time that she was an inmate at South Middlesex Correctional Center ("SMCC") in Framingham, Massachusetts.

According to Chao, the guard, Moises Ballista ("Ballista"), began flirting with her in the spring of 2003, and their relationship quickly became sexual. Over the course of more than one year, she "serviced him" with fellatio (and occasionally, intercourse) fifty to one hundred times, sometimes three times in one night. Although she once spoke of and wrote about a romantic relationship between the two, and that she was in love with him, she came to realize that he was

using her for his own sexual gain -- just as he used four other inmates during the same time period.  Their sexual encounters continued despite "rumors" that Ballista himself reported to prison supervisors, taking pains to deny them.  The encounters ended only when Chao finally told investigators about their sexual relationship in the summer of 2004.  Ballista was suspended, later prosecuted and convicted of sexual relations with an inmate, a crime against public justice in violation of Mass. Gen. Laws c. 268 § 21A.

Upon her release from the correctional center, Chao filed this civil suit against Ballista and several prison officials.  She brings claims under 42 U.S.C. § 1983 and the Massachusetts Civil Rights Act (MCRA), Mass. Gen. Laws ch. 2 § 11H and 11I against the following defendants:  Ballista, the prison guard and alleged perpetrator; Kathleen Dennehy ("Dennehy"), the Commissioner of the Massachusetts Department of Correction ("DOC"); Kelly Ryan ("Ryan"), the Superintendent of SMCC; Randy Azzato ("Azzato"), the current Director of Security of SMCC;[1] and Chris Tortora ("Tortora"), Training Officer of SMCC.  She alleges that these individuals violated her constitutional and civil rights; and that Ballista is further liable for assault and battery; negligence; wanton and reckless conduct; and negligent or intentional infliction of emotional distress.[2]  Pl.'s 3d Am. Compl. (document #55).

---

[1] Azzato is the current director of security at SMCC.  He did not begin working at SMCC or even at the DOC until 2005, after Chao had already been paroled.  Ryan Aff. ¶ 29 (document #107-1).  He therefore has no relationship to Chao, Ballista or to this case.  The claims against him are DISMISSED.

[2] Seemingly for the first time at summary judgment, the plaintiff claims that she also has a claim under the Prison Rape Elimination Act of 2003 (PREA), 42 U.S.C. § 15601 et seq.  She has cited no authority for her contention that PREA allows a private cause of action, however, and every court to address the issue has held otherwise.  See, e.g., LeMasters v. Fabian, 2009 WL 1405176, at *2 (D. Minn. 2009); Bell v. County of Los Angeles, 2008 WL 4375768, at *6 (C.D. Cal. 2008); Chinnici v. Edwards, 2008 WL 3851294, at *3 (D. Vt. 2008); Rindahl v. Weber, 2008 WL 5448232, at *1 (D.S.D. 2008).

Chao's main claim against Ballista is that he violated her constitutional rights by sexually exploiting her while she was incarcerated under his supervision. Her claim against the prison officials is that they failed to protect her from Ballista's repeated sexual battery in violation of the Eighth Amendment and 42 U.S.C. § 1983. To establish a section 1983 claim against a state official under the Eighth Amendment, a plaintiff must demonstrate that (1) the alleged conduct is "objectively, sufficiently serious"; and (2) that the prison official was "deliberately indifferent to the plaintiff's rights, health or safety" and had a "sufficiently culpable state of mind." Farmer v. Brennan, 511 U.S. 825, 834 (1994).

Defendants argue that plaintiff fails on both grounds -- there was no "objectively, serious harm" and further, defendants were surely not responsible by being "deliberately indifferent" to Chao's rights.

According to the defendants, there was no "serious harm" here because the sexual relationship was entirely consensual. Consent, according to the defendants, is demonstrated, *inter alia*, by the fact that Chao never complained to the authorities until some time after the relationship had started, repeatedly denied it when the matter was initially investigated, and at one point, described the relationship as "romantic." In effect, the defendants are saying: "It surely was wrong, Ballista surely should have been prosecuted criminally, but it does not rise to the level of a constitutional injury."

Defendants' position is not supported in fact or law. It raises two questions, neither of which can be resolved on summary judgment: As a factual matter, what is "consent" in the prison context given the obvious power imbalance between a woman inmate and her male guard? And, as a legal matter, however the relationship is characterized, can an arguably

consensual sexual relationship, in this very unique setting, rise to the level of "sufficiently serious harm" that the Eighth Amendment requires?

I will not say, as some courts have apparently said (mainly when the inmate is male and the guard female) that a prisoner's arguable consent ends all Eighth Amendment inquiry. As I describe below, a relationship between an inmate and a guard is presumptively coercive. Each of the so-called indicators of consent emphasized by defendants could as well mean the opposite; she does not disclose the relationship or denies it when asked precisely because of her vulnerability to the guard's retaliation; she continues the relationship without making a formal complaint, not because she wants to but because she is afraid to stop it, not unlike a woman suffering from domestic abuse. And the relationship necessarily risks serious psychological harm to the inmate -- particularly where female inmates tend to be especially vulnerable to abuse. It surely may cause the kind of serious harm envisioned by the Eighth Amendment no matter how rosy its veneer. But the issue on summary judgment is not an abstraction. Whether the relationship was coercive *in this case*, whether it caused constitutional harm to *this plaintiff* is a matter for a fact-finder, not for a judge.

Even if there was Eighth Amendment harm, defendants argue, these individual defendants, who range from Ballista, the alleged perpetrator, to various supervisory personnel, were not liable under section 1983 because they were not sufficiently aware of the risk of harm to Chao. Since the sex was consensual, and the participants denied it, they claim, it was virtually impossible to detect or prevent. Nevertheless, they were surely aware of the risks of converting a male prison to a female prison, as occurred at SMCC shortly before Chao arrived; they were aware that there were few security cameras; and they were aware that there were several places

in this relatively small institution where inmates and guards could go unsupervised. As superintendent, Ryan heard rumors and indeed eye witness accounts about sexual activity between inmates and staff, and in particular, rumors about Ballista. But while defendants claim they did their very best to manage a responsible transition to a female prison, to train their officers, to institute good policies, and to investigate allegations when they arose, the plaintiff argues that they did not, that they were "deliberately indifferent" to Chao's health and safety.

As with the question of "serious harm," defendants' alleged "deliberate indifference" is plainly not an issue that can or should be resolved as a matter of law on summary judgment. Each side offers expert testimony, as well as fact witnesses on the roles and responsibilities of the actors, prison policies and response mechanisms. Each defendant raises different answers to the factual questions – the standard of "what did they know and when did they know it?" As such, whether these defendants responded reasonably to the risks of which they were aware is also a factual question. They may have, but that is for a jury to decide.

For the reasons that follow, I **DENY** Ballista's Motion for Summary Judgment (**document #100**); and I in **GRANT in part and DENY part** Dennehy, Ryan, Tortora and Azzato's Motion for Summary Judgment (**document #97**).

I.      FACTUAL BACKGROUND

The factual background provided here is taken in the light most favorable to Chao as summary judgment procedure requires. Moreover, since the personal facts concerning Chao's background were filed under seal, the published version of this opinion will exclude section A in which those facts are recited.

**A.** **[REDACTED]**
**B.** **Chao and Ballista**

The events in question occurred at SMCC.  Chao's room was directly across from Ballista's office.  Like other men in her life, the relationship began with courtship and sweetness.  He flirted with her and made her feel special.  He told her that she was different from other inmates and that she did not belong there.  He asked her about her children, and she told him about the abusive relationships in her past.  Chao Dep. 23:6 - 26:18, Aug. 19, 2010.

The parties' accounts of what happened next differ substantially.  Taking the facts most favorably to Chao, and on this truncated summary judgment record, I find the following:  One day in the spring or summer of 2003, Chao was alone working out in the gym.  Ballista found her there, and he told her to come with him.  They went into an electrical closet, and he silently undid his pants and pulled out his penis.  Without saying a word, she performed fellatio on him.  He pulled out a rubber glove and ejaculated into it.  And then she left.  Id. at 28:2 - 30:19.

They continued to talk and have friendly conversations, but they did not speak about this incident.  Id. at 31:8-18.  About a week later, he told her to go up to an empty bedroom on the third floor.  He followed her there, turned her around so that her back was to him, and pulled down her shorts.  Id. at 31:21 - 32:23.  He had intercourse with her, using a rubber glove as "prophylaxis."  Chao Written Stmt., Ballista Mot. Summ. J., Ex. B, at 3 (document #100-1).[3]

While her statement of facts and opposition to summary judgment allege that she never had any feelings for Ballista, her own account in her written statement and the psychiatric evaluation belie this contention.  Ballista was posted on the third floor, and she requested to be

---

[3] The plaintiff submitted this written statement to prison officials as part of the investigation that resulted in Ballista's termination and ultimate prosecution.

placed in a special program so that she could be closer to him.  Id. at 4.  The sexual encounters

continued.  She performed fellatio or they had intercourse in the horticultural room, in the

basement, and in the locker room.  He continued to use a glove for "protection."  Id. at 4-6.

Once she told him that she wanted to "clean" the trailer where inmates met with their children.

He followed her there, and they had intercourse.

Shortly afterwards, he told her that he could not "do it anymore" and that he felt like he

was taking advantage of her and her situation.  Id. at 7.  She cried and told him that she had

feelings for him; she wanted them to be together.  Id. at 7-8.  They talked more and more and

eventually became sexual again.  Once when they had intercourse, he used a plastic bag, rather

than a rubber glove, for "protection."  Afterwards he panicked, told her that he was scared that

she would get pregnant and "shipped" away from him.  Id. at 10.  She began taking birth control

-- with pills disbursed by prison medical staff -- but they never had intercourse again.

Chao kept a calendar of every sexual encounter she had with Ballista, but she stopped

recording after this point.[4]  Id. at 10.

The "relationship" became more and more manipulative and one-sided, and eventually

she wanted it to end.  See Psych. Eval. at 6.  Any desire to be intimate with Ballista was long

gone by the time he was on night duty, when he came to her again and again.  She said, "Up to

three times a night he would come into my room, wake me up for me to give him oral sex."  Id.

at 7.  See also id. at 6 ("And that became the routine; months and months of just giving him oral

sex, she remaining fully dressed; the encounter being purely carnal, no affection, no caressing --

just servicing him.").

_____

[4] Chao has given no explanation for why she kept this calendar.

By May of 2004, Chao no longer wanted to be with Ballista.  She wrote:

> In May 04 I didn't want to be with Moises any more.  I didn't know
> how to stop what had been started so long ago.  I then realized how
> I was being used.  I felt ashamed, dirty, like a whore.  I cried after
> each visit to my room, at times I would act like I was sleeping and
> wouldn't wake up when I heard him in my room.

Chao's Written Stmt. at 10-11.  She was afraid to stop it and afraid to report it:  "I feared that if I stopped the sexual relationship I would be punished, either by Ballista or others, and sent back to the main prison facility.  Ballista and I discussed these fears.  He was aware of my fears."  Chao Aff. ¶ 41-43 (document #32).  Chao never definitely said "no" verbally to Ballista.  Chao Dep. 117:22-24.  The encounters ended in August of 2004, when Chao garnered the courage to talk to investigators who visited her at her job at Bruegger's Bagels.

Throughout their "relationship," Ballista enticed Chao with extra benefits at the prison.  He told her when her room was going to be "tossed" or searched so that she could make sure she had no contraband.  He took contraband (tongue ring, tweezers) home for her and then brought it back whenever a "toss" was over.  Chao Aff. ¶ 14-19.  He mailed letters for her and allowed her to use his cell phone to talk with her children.  Chao Dep. 125:11 - 126.

Chao was not the only subject of Ballista's sexual appetites.  He has admitted to having sexual encounters with at least four others while stationed at SMCC.  Ballista Dep. 25:6 - 27:2, Aug. 2, 2010.

### C. Prison Conditions and Investigation

#### 1. Transition to a Female Prison

SMCC is a relatively small minimum security facility that is akin to a college dormitory.  Ryan Aff. ¶ 24.  It was converted from a male to a female prison in 2002, shortly before Chao

was transferred there. Although there was an effort to replace many of the male guards with female guards or guards more experienced with female inmates, the Union objected and few staffing changes were made. Pl.'s St. Facts ¶ 4.

Before the transition, all officers -- including Ballista -- attended three days of training on "female inmate management." Tortora Aff. ¶ 4 (document #106-1). The supervisory officials have produced voluminous records about training and materials that were provided to the male guards during and after the transition. The plaintiff, however, argues that the training was insufficient to help guards deal with female inmates, whom Dennehy has recognized are particularly vulnerable to abuse and mental illness. See Jacqueline L. Kotkin, Expert Opinion Report, Jan. 23, 2011, Pl.'s Ex. E [hereinafter Pl.'s Expert Rep.]; Dennehy Dep. 40, Dec. 22, 2010.

Because SMCC is a low security prison, the inmates had rooms with doors rather than open cells, and they were thus more accessible to deviant guards. There were few security cameras around the facility and plenty of areas for parties to avoid detection. The plaintiff alleges that sex was so common that the horticultural room, which had beds in it and was directly across from the staff locker room, was called the "Hotel."

### 2.    Environment

The plaintiff alleges that sexual misconduct and abuse were rampant. The allegation and investigation reports reveal an institution where two guards had sexual contact with multiple inmates. See Mem. to Mark Reilly, Chief of Investigative Services, Inmate Allegations of Sexual Assault by Correctional Program Officer Moises Ballista, Pl.'s Ex. C [hereinafter Ballista Allegation Report]; Investigation Report: Investigation into the Allegations made by Inmate

Wanda Cintron that she has Information Regarding Staff Sexual Misconduct between CPO Moises Ballista and Former Inmate Wanda Rivera, Pl.'s Ex. C [hereinafter Jackson Investigation Report]. Ballista testified that the hallways echoed with sexual comments such that he thought it was normal: "[I]t was happening with everybody. I mean, it was -- a lot of other people would do it. I mean, it was something that -- it became a common thing and I thought it was just part of the nature and the main thing is just not to have relations." Ballista Dep. 115:24 - 116:5.

Ballista was having sex with at least five prisoners. Id. 25:9 - 27:2. Inmate Tuwanda Bowles told investigators that Ballista would "'grope' her breast or just 'cop a feel." She recalled a time when Ballista came into her room, jumped on top of her and said, "come on just a quickie, come on, come on." Ballista Allegation Report at 5. She said that she refused, and he then moved on to her friends. Id. He often had intercourse or fellatio with them in the "Hotel," in the basement, in restrooms, in closets. Inmates "kept the peak" to warn when others were coming down the hall. Id. at 2.

Another corrections officer, Terrance Jackson, also engaged in sexual misconduct with female prisoners. See Jackson Investigation Report. They called Jackson "Darkness" and Ballista "Plantano." Id. at 11; 15. Sex became a joke. One inmate told the officer that inmates "would hold 'story time' with some of the other girls and talk about CPO Ballista's penis being discolored." Ballista Allegation Report at 2.

### 3. "Rumors" and Investigations

When rumors circulated, Jackson and Ballista made their own reports to the supervisors to forestall any allegations. See, e.g., Incident Report, May 23, 2003 (Jackson notes rumors about him and then states: "I have never placed myself in any compromising situations with any

of these ladies."). Ballista filed two reports specifically denying any sexual misconduct with Chao. See, e.g., Incident Report, Mar. 17, 2004, Pl.'s Ex. G ("Inmate Chao approached me regarding that rumors have been spreading about this officer. Inmate Chao spoke to CPO Perez regarding this issue. I am bringing this issue to your attention again as it has come up in the past. Inmate Chao is not on good speaking terms with her ex-roommate, whom she believes is the root of all the rumors."). After one of these reports, he had a conversation with an investigator who reinforced SMCC norms and protocols. Ryan Aff. ¶ 42.

Nonetheless, Ballista or Jackson (or both) were formally investigated on three occasions. Jackson was investigated in May of 2003, when "rumors" were circulating about sexual misconduct with Wanda Rivera ("Rivera"). One inmate told the investigating officers that she had seen Jackson kiss Rivera in the kitchen. Another inmate reported that she walked in on them kissing behind a dry storage door. In spite of these eye-witness reports made to officers, the "allegations of inappropriate behavior between inmate Rivera and CPO Terrance Jackson were deemed unsubstantiated." Jackson Investigation Report at 16.

Jackson *and* Ballista were investigated in March of 2004, when an inmate, Wanda Citron ("Citron"), told a counselor that she had information that Ballista was "messing around" with Rivera. Citron was transferred to MCI-Framingham, a higher security prison, "pending the investigation." Ryan Aff. ¶ 51. Although Citron had told investigators that she was in the corridor while Ballista and Rivera had intercourse in the "Hotel," the investigator found the allegation to be "unsubstantiated." Jackson Investigation Report at 28. (Ballista has since admitted to a sexual relationship with Rivera. Ballista Dep. 25:9-11.) In any event, the March

2004 investigation finally confirmed that *Jackson* had an inappropriate sexual relationship with Rivera -- the same allegations that had been made a year earlier.

During the March 2004 investigation, Ryan assigned Ballista to "the Bubble," a glass encased guard post position where she believed he would have little to no access to inmates. Ryan Aff. ¶ 52. Nevertheless, according to Chao, his conduct vis-a-vis Chao continued. He engaged in sexual acts with her in a nearby bathroom. Around this time Chao was interviewed and denied having any sexual relationship with Ballista. Chao Dep. 47:16-24. Once the investigation revealed "unsubstantiated allegations," Ballista returned to regular duty with regular access to inmates.

It was not until Ryan received an anonymous letter from an inmate at MCI-Framingham alleging that Ballista had engaged in sexual activity with Chao that Ryan ordered a third investigation. And as part of this final investigation, Chao finally admitted to the sexual encounters. Ryan Aff. ¶ 56. She explains that she did not report earlier because she feared retaliation. She alleges that it was "common knowledge" that inmates would be shipped off to the higher security prison, like MCI Framingham, placed in solitary confinement, or lose visitation with their children if they reported sexual abuse or misconduct.

Ballista was criminally charged, prosecuted, and convicted of sexual relations with an inmate. He served four and a half months in state prison. Ballista Dep. 22:16 - 23:8.

## II.    STANDARD

Summary judgment is appropriate only when all of the pleadings and supporting documents, viewed in a light most favorable to the non-moving party, present no genuine issue

of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

Even in cases involving motive and intent, summary judgment "may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation."  Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993).   Upon a motion for summary judgment, the plaintiff must set forth specific facts that show that there is a genuine issue for trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Torres-Negron v. Merck & Co., 488 F.3d 34, 39 (1st Cir. 2007).

In this case, the defendants have moved for summary judgment primarily on the grounds that the conduct between Chao and Ballista was consensual.  All of the defendants argue that consensual sex between a guard and an inmate does not rise to the level of a violation of the Eighth Amendment.  The supervisory officials further maintain that because the sex was consensual, it was virtually impossible to detect or prevent; therefore they cannot be liable for failure to protect.  And finally, Ballista argues that consent is a defense to assault and battery, negligence, wanton and reckless conduct, and negligent or intentional infliction of emotional distress.  I will consider each argument in turn.

## III.    EIGHTH AMENDMENT

Chao's main claim against Ballista is that he violated her constitutional rights by sexually exploiting her while she was incarcerated under his supervision.  Her claim against the prison officials is that they failed to protect her from Ballista's repeated sexual battery in violation of the Constitution.

Although Chao brought several constitutional claims, they are primarily "bounded by the Eighth Amendment, the 'explicit textual source of constitutional protection' in the prison context." Adkins v. Rodriguez, 59 F.3d 1034, 1037 (10th Cir. 1995) (quoting Graham v. Connor, 490 U.S. 386, 395 (1989)).[5] Accordingly, I will consider her claims under the rubric of the Eighth Amendment.

To establish a section 1983 claim against a state official under the Eighth Amendment, a plaintiff must demonstrate that (1) the alleged conduct is "objectively, sufficiently serious"; and (2) that the prison official was "deliberately indifferent to the plaintiff's rights, health or safety" and had a "sufficiently culpable state of mind." Farmer v. Brennan, 511 U.S. 825, 834 (1994). I will consider each in turn.

### A.     Sexual Misconduct May Be "Objectively, Sufficiently Serious"

The Supreme Court has not defined "sufficiently serious," but the vast majority of courts to have addressed the issue have found that sexual abuse or harassment of an inmate by a corrections officer may be "sufficiently serious" as to violate the Eighth Amendment. See, e.g., Daskalea v. District of Columbia, 227 F.3d 433 (D.C. Cir. 2000) (affirming Eighth Amendment claim where prison guards sexually assaulted plaintiff and forced her to do a strip tease); Boxer v. Harris, 437 F.3d at 1111; Freitas v. Ault, 109 F.3d 1335, 1338 (8th Cir. 1997); Boddie v. Schneider, 105 F.3d 857, 860-61 (2d Cir. 1997) (noting that "there is nothing in the decisions of the Supreme Court or of this court that denies the existence of [a sexual abuse claim under §

---

[5] The plaintiff may have had a Fourth Amendment claim that her right to privacy was violated. See Boxer v Harris, 437 F.3d 1107, 1111 (11th Cir. 2006) (plaintiff stated a § 1983 claim for violation of his privacy rights when he was forced to masturbate in front of female guard). Chao does not argue her Fourth Amendment claim in opposition to summary judgment, however, and it is therefore waived. See Grenier v. Cyanamid Plastics, Inc., 70 F.3d 667, 678 (1st Cir. 1995) (issue raised in a complaint but not argued at summary judgment is deemed waived).

1983] and there is, instead, much to support it"); Women Prisoners v. District of Columbia, 877 F. Supp. 634, 665 (D.D.C. 1994) (reversed and remanded in part on other grounds by Women Prisoners v. District of Columbia, 93 F.3d 910 (D.C. Cir. 1996)).

However, whether or not the alleged abuse rises to the level of "unnecessary and wanton infliction of pain" that is prohibited by the Eighth Amendment will depend on the particular facts. Boddie, 105 F.3d at 860-61 (holding that "there can be no doubt that severe or repetitive sexual abuse of an inmate by a prison official can be 'objectively, sufficiently serious' enough to constitute an Eighth Amendment violation" but that verbal harassment and unwanted touching of a male prisoner by a female officer was not sufficiently serious). Some courts have held that the plaintiff must show more than a *de minimis* injury. Boxer, 437 F.3d at 1111 (concluding that "female prison guard's solicitation of a male prisoner's manual masturbation, even under the threat of reprisal, does not present more than de minimis injury").

### 1.    "Voluntary" Sex and the Eighth Amendment

The defendants argue that while sexual abuse may give rise to an Eighth Amendment claim, consensual sex between an officer and an inmate may not. Chao voluntarily engaged in a sexual relationship, they argue, and therefore her claim fails.

As a preliminary matter, there is surely a triable question of fact as to whether the repeated sexual encounters in this case were consensual. As I will explain below, sex in prison is a complex and risky phenomenon; "consent" is not easy to determine amidst power dynamics between male captors and female inmates. In fact, *any* sexual contact with an inmate -- consensual or not -- is deemed "sexual misconduct" under the law and prison policies. See Department of Correction, Staff Sexual Misconduct with Inmates, Pl.'s Ex. A (defining sexual

misconduct as "conduct of a sexual nature by any employee, contractor or volunteer that is directed toward inmates under the care, custody and supervision of the department. Sexual misconduct with inmates includes acts or attempts to commit acts of sexual contact, sexual abuse, invasion of privacy and intimacy."); PREA, 42 U.S.C. § 15609(11) ("The term 'sexual fondling' means the touching of the private body parts of another person (including the genitalia, anus, groin, breast, inner thigh, or buttocks) for the purpose of sexual gratification."). See also Bureau of Justice Statistics, U.S. Dept. of Justice, Survey on Sexual Violence, State Prison Systems, at 2, 5 (2004) (defining staff sexual misconduct as consensual or non-consensual sexual acts).

In this case, however the sexual activity started, the plaintiff maintains that it became abusive over time. By May of 2004 she no longer wanted to engage in any sexual conduct with Ballista. Chao's Written Stmt. at 10-11. In fact, viewed in the light most favorable to the plaintiff, the facts recounted by Chao describe a relationship not unlike one in which there is domestic abuse -- repeated sexual encounters from which she believed she could not escape without reprisal. Even if she consented to individual sexual acts, the totality of the circumstances suggest an ongoing abusive relationship -- the harms of which may rise to the level of a violation of the Eighth Amendment. Clearly, sexual abuse is not a legitimate part of an inmate's punishment. Farmer, 511 U.S. at 833-34 ("Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'"). As I explain below, a coercive relationship with a guard *may* rise to the level of "sufficiently serious" harm to constitute an Eighth Amendment violation depending on the facts and circumstances.

To be sure, some courts have held that where a prisoner consented to sexual relations with an officer, that prisoner is barred from bringing an Eighth Amendment claim for sexual misconduct, harassment or abuse. Freitas, 109 F.3d at 1339 ("[W]e hold that, at the very least, welcome and voluntary sexual interactions, no matter how inappropriate, cannot as matter of law constitute 'pain' as contemplated by the Eighth Amendment."); Hall v. Beavin, 1999 WL 1045694, at *1 (6th Cir.); McGregor v. Jarvis, 2010 WL 3724133, at *11 (N.D.N.Y.); Phillips v. Bird, 2003 WL 22953175, at *6 (D. Del. 2003); Fisher v. Goord, 981 F. Supp. 140, 174 (W.D.N.Y. 1997). At the same time, other courts have held that any sex with a prisoner, consensual or not, is a *per se* violation of the Eighth Amendment. See Carrigan v. Davis, 70 F. Supp. 2d 448, 452-53 (D. Del. 1999) (holding as a matter of law that vaginal intercourse or fellatio between an inmate and officer is a *per se* violation of the Eighth Amendment); Cash v. County of Erie, 2009 WL 3199558, at *2 (W.D.N.Y.) ("Because plaintiff was incarcerated, she lacked the ability to consent to engage in sexual intercourse with [defendant guard] Hamilton as a matter of law. See N.Y. Penal Law § 130.05(3)(f)."). The First Circuit has yet to encounter this question. I take neither position -- I will not say that consensual sex is *never* an Eighth Amendment violation, nor will I say that it is *always* one.

The facts of the cases cited by the defendants to support the "never" claim, are not at all on point. In Freitas, for instance, a male inmate brought a claim against a female guard for sexual harassment after their romantic relationship ended. He had written her "hot sexy" letters, she had dressed in tight skirts, and they had kissed and hugged. Freitas, 109 F.3d at 1336. In Hall, a male inmate brought claims for violations of his Fourth and Eighth Amendment rights after *he* was found guilty by a prison infraction board for engaging in an improper relationship with a female

staff member.  1999 WL 1045694, at *1.  <u>McGregor</u> likewise involved a male inmate and a female officer, though this relationship was more long-term and sexual, and the officer gave him minor privileges during the relationship.  2010 WL 3724133, at *1-2.  In <u>Fisher</u>, the judge simply found the infamous Amy Fisher to be incredible when she alleged sexual misconduct on the part of several prison guards with whom she had been sexually involved.  He found that she had plotted to bring this lawsuit against the prison staff and *even if* her allegations were true, they could not rise to the level of an Eighth Amendment violation because the sex was consensual. <u>Fisher</u>, 981 F. Supp. at 175.

The circumstances of these cases illustrate the complexity of sexual relationships.  The power dynamics between men and women, and the various combinations of male-on-male, male-on-female, female-on-male harassment, are fraught with societal and historical biases.  At best, the decisions must be interpreted as concluding that *in these circumstances*, the plaintiff's allegations were insufficient to show the kind of pain or injury contemplated by the Eighth Amendment.  Significantly, the parties have cited no case in which a court has addressed the facts before me -- in which a female inmate and a male officer engaged in an extended relationship involving sexual intercourse and fellatio, the consent of which is contested in whole or in part.[6]

In any case, to the extent that these cases hold *as a matter of law* that voluntary sex between an officer and an inmate can *never* amount to "pain" or *never* reach the seriousness required by the Eighth Amendment, I must strongly disagree.  The <u>Phillips</u> court, for example, stated the principle without equivocation:  "Consensual sex between two adults does not constitute cruel and unusual punishment simply because it occurs within the walls of a prison."

---

[6] <u>Phillips</u> involved sexual intercourse between a male officer and a female plaintiff, but the parties stipulated that she had consented to the four sexual encounters.  2003 WL 22953175, at *1.

2003 WL 22953175, at *6.  But sex within the prison is simply not the same as sex outside --

particularly between a female inmate and her captor.  As Judge Green noted  in <u>Women Prisoners</u>,

> In free society, a woman who experiences harassment may seek
> the protection of police officers, friends, coworkers or relevant
> social service agencies.  She may have the option of moving to
> locations where the harassment would no longer occur.  In sharp
> contrast, the safety of women prisoners is entrusted to prison
> officials, some of whom harass women prisoners and many of
> whom tolerate the harassment.  Furthermore, the women are tightly
> confined, making their escape from harassment as unlikely as
> escape from the jail itself.

877 F. Supp. at 665.  A guard is a female inmate's captor; the relationship between them is

inherently imbalanced.  A female inmate must rely on her male captor(s) for basic necessities,

phone privileges, visits with her children, protection from harm from them or other inmates,

health needs.  The men in these circumstances have *absolute* power over women.   Should she

wish to end the relationship -- and the termination of coercive relationships is often fraught even

in the outside world -- she cannot simply "leave."

Indeed, sex in prison between an inmate and a guard often has the coercive element of

trade as between less than equal participants.  An inmate may accept a male guard's sexual

advances or even initiate a sexual relationship with him in exchange for safety or goods.  In some

prisons protection is a commodity to be bargained.  An inmate may be assured that she will be

protected if she gives sexual favors to a guard -- or alternatively be threatened if she does not.

Sex may also be traded for cigarettes, candy, food, work assignments, or most troubling, more

visits with children.  Officers may use their access to external sources to force or coerce inmates

to perform sexual favors.[7]  See Fisher, 981 F. Supp. 940 ("I am disturbed by the notion that an inmate might feel compelled to perform sexual favors for correctional officers in order to be on the officer's 'good side'.  Such quid pro quo behavior is inappropriate, despicable and serves no legitimate purpose.").

Whether or not these relationships are truly "consensual" cannot be found -- or rejected -- as a  matter of law.  There is enough about the prison environment -- and this case in particular -- that requires a trial.

### 2.    Harms of Sexual Misconduct

Even if not all relationships between inmates and guards are coercive, sex in prison between inmates and officers risks enormous harm that *could* rise to the level of seriousness required by Eighth Amendment jurisprudence, again depending upon the circumstances.  The risks include retraumatization, physical and psychological harm, and compromised physical safety.

Women in prison are particularly vulnerable.  Tortora, Dennehy, and Ryan conceded that female offenders tend to have a history of sexual, mental, and physical abuse.  Tortora Aff. at ¶7; Dennehy Dep. 40:15-22.  Women bring their histories to prison with them; this abuse has lasting consequences for them.  See Department of Correction, Dealing with the Female Offender, Def. Ex. 5, at 14 (document #106-5) ("Many inmates were originally victims of physical, mental and/or sexual abuse as children, which precipitated such abuse as adults.  Male dependency problems tend to plague female inmates.  They believe they have no choice but to accept abuse

---

[7] The defendant supervisory officials argue that the existence of "benefits" indicates *consent* rather than coercion.  See, e.g., McGregor 2010 WL 3724133, at *10 (implying that the quid pro quo nature of the relationship was an indicator of consent).  I disagree.  Inherent with the quid pro quo is the threat that the benefits -- or even necessities -- may be withdrawn at any time by the officer.

from a dominant male.").  Female inmates are thus especially susceptible to exploitation by authority figures such as male prison guards.  Tortora Aff. ¶ 7.

Coercive or abusive relationships between staff and inmates risk not just physical but also psychological harm.  Sexual misconduct of guards, which includes "consensual" touching,[8] may cause "significant depression, nausea, frequent headaches, insomnia, fatigue, anxiety, irritability, nervousness, and a loss of self-esteem."  Women Prisoners, 877 F. Supp. at 665 (holding that these effects are "more than enough evidence to satisfy the objective component of the Eighth Amendment").  For *some* vulnerable female prisoners, a relationship with a guard may result in retraumatization or post-traumatic stress disorder.  See Pl.'s Expert Rep. at 11 ("The likelihood that female inmates have suffered prior abuse means that the custodial sexual encounter may amount to a reenactment and reinforcement of trauma.") (quoting Dr. Cassandra Newkirk, Sexual Misconduct in Women's Facilities, the Current Climate, Corr. Today, Oct. 1, 2003).

In addition to the physical manifestations of psychological distress, sex with an officer has other serious health risks for a female inmate, including sexually transmitted infections and unwanted pregnancy.  See Women Prisoners, 877 F. Supp. at 643 ("[W]omen inmates have a greater risk of contracting sexually transmitted diseases such as syphilis, AIDS, or gonorrhea, and other illnesses such as cervical cancer and sterility due to infection.").  See also Dennehy Dep. 41:3-6 (noting the extraordinarily high prevalence of HIV at MCI-Framingham).  Prohibited sex in a prison is rarely "safe" as the participants may not use prophylaxis in their haste not to get caught.  Condom use often requires negotiation, even in the outside world, but a female inmate with no access to condoms has no bargaining power for safe sex inside the prison walls.

---

[8] See Bureau of Justice Statistics, U.S. Dept. of Justice, Survey on Sexual Violence, 2004, State Prison Systems, 2, 5 (2004) (defining staff sexual misconduct as consensual or non-consensual sexual acts).

Unwanted pregnancy is particularly traumatic for a female inmate. See Women's Prisoners, 877 F. Supp. at 647 (noting that postpartum inmates have very little time to visit with their babies boarding at the hospital).

Given this backdrop, I will surely not conclude, as a matter of law, that arguable consent vitiates the possibility of serious harm.

### 3. Harm to Chao

Whatever the risks and dangers of prison sexual relationships in general, the harms are particularly clear in the instant case. A jury could well believe that Chao had to suffer psychological abuse from which she could not escape, however the Chao-Ballista relationship was characterized. A jury could well believe that no matter how it started, at some point, the relationship became abusive.

In exchange for the sexual favors, Chao claims that she received benefits, including phone calls with her children, extra mail, and warnings about "tossups." But implicit in these benefits was a threat: just as benefits could be given, so could benefits be taken away. She worried that she might not be able to see her children, that she might be put in solitary confinement, that she might be sent back to a higher security prison. In fact, she had seen others be "shipped" back to MCI-Framingham.

Here, the psychiatric evaluation, if a jury finds it to be persuasive, tells a story of a woman who has been sexually traumatized since she was a little girl, who is particularly vulnerable to abuse by men who appear to be charming and then become abusive over time. Indeed, according to Chao, Ballista *knew* of this vulnerability -- not just of women in prison generally -- but of Chao in particular. She told him of the abuse in her past. She became dependent on him, and even he acknowledged that he was abusing the power that he had over her. Chao Written Stmt. at 7. And

when it was over, she again felt ashamed and humiliated, guilty, and fearful. She told the therapist, "I still don't like talking about it. I still have guilt. I never said no to him. I feel dumb that I hoped he'd have feelings for me." Psych. Eval. at 7.

In addition to psychological harm, however, Ballista subjected her to extraordinary risk of physical harm. Ballista continually used a thin rubber glove or even a plastic bag as protection. Such primal remedies are certainly not sufficient to protect against pregnancy or sexually transmitted infections -- particularly when he had multiple sexual partners.

Whether or not the culmination of these harms is "sufficiently serious," in short, is a genuine issue of material fact.[9]

Again, let me be clear: I do not find as a matter of law that *any* intercourse or oral sex violates the Eighth Amendment. But neither do I find that voluntary sex may *never* violate the Eighth Amendment. A sexual relationship between an inmate and a guard *may* rise to the level of harm required for an Eighth Amendment claim. Sex and coercive relationships are complicated and the level of harm -- or lack thereof -- will depend on the facts of a given case. Boddie, 105 F.3d at 860-61.

### B.      Sufficiently Culpable State of Mind

It is obviously not enough that the plaintiff show that the conduct was objectively, sufficiently serious. She must also prove that the defendants had a "sufficiently culpable state of

---

[9] Given the potential harm of sexual misconduct to female inmates generally, and to Chao in particular, I find it persuasive that the federal government and the majority of states, including Massachusetts, have determined that at least in the criminal context, an inmate cannot consent to sex with staff. See, e.g., 18 U.S.C. § 2243; Mass. Gen. L. ch. 268 § 21A. A bright line rule deters sexual misconduct and protects inmates from abuse. Indeed such a bright line rule is tempting in the Eighth Amendment context as well. See Carrigan, 70 F. Supp. 2d at 452-53 (concluding "as a matter of law, that an act of vaginal intercourse and/or fellatio between a prison inmate and a prison guard, whether consensual or not, is a per se violation of the Eighth Amendment"). Nonetheless, I recognize that the fact that an inmate is incapable of giving consent in the criminal context does not necessarily mean that voluntary sex per se violates the Constitution in the civil rights context. McGregor, 2010 WL 3724133, at *32.

mind." Farmer, 511 U.S. at 834. It is not necessary that the official be aware of the *actual* harm, but he must be shown to have been aware of a *substantial risk of harm*. Id. at 842 ("[A]n Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.").

### 1. Ballista

Despite his claims of a wholly consensual relationship, the facts presented by the plaintiff are sufficient to show that Ballista exhibited the classic deliberate indifference to the harm he was visiting on Chao. Ballista initiated their first sexual encounter and -- according to the plaintiff -- grew more self-serving and abusive over time. He came into her room sometimes three times a night and asked her to "service him."

Ballista was aware of the power dynamics between them. He expressed remorse to Chao and told her that he felt that he was taking advantage of his position. Def. St. Facts at 5 (document #106). And he was aware that she was particularly vulnerable to psychological harm. She told him about her past abusive relationship. See Chao Written Stmt. at 3. Ballista was especially reckless with her health, as he used rubber gloves or plastic bags as protection during their sexual encounters.

These facts are more than enough at summary judgment to establish that he was recklessly indifferent to her health, safety, and her right to be free from sexual harassment or abuse. He knew of her vulnerabilities, knew of the serious harm that could result from his conduct and, the record suggests, flagrantly disregarded those risks.

### 2. Dennehy, Ryan and Tortora

The question of whether the supervisory officers had a sufficiently culpable state of mind, however, is more complex. Chao's Eighth Amendment claim against these officers is based on their failure to protect Chao. To prevail on a "failure to protect claim," Chao must show not only that she was incarcerated under conditions that posed a substantial risk of harm, but also that the officials were *actually aware* of that risk; not an insubstantial test. In Farmer, for example, the Supreme Court held that the test of deliberate indifference is subjective: "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." 511 U.S. at 837. See also Burell v. Hampshire County, 307 F.3d 1, 8 (1st Cir. 2002) (noting that "deliberate indifference" is "more blameworthy than negligence."). And even where the defendant is aware of the risk, he will avoid liability if he responded to that risk in good faith -- even if the harm came to pass. Id.

After Farmer, courts have upheld failure to protect claims against prison officials where the structure of the prison, which was obvious to all concerned, created a substantial risk of sexual assault or abuse on inmates. For example, in Calderon-Ortiz, a plaintiff brought a section 1983 claim against prison officials for failing to protect him from sodomy by an inmate in violation of the Eighth Amendment. Calderon-Ortiz v. Laboy-Alvarado, 300 F.3d 60, 65-66 (1st Cir. 2002) (denying a motion to dismiss for failure to state a claim). The state prison in question did not separate the inmates according to their safety needs and security risks. Calderon was housed in a corridor of two-person cells, where one officer was stationed at or near a "control" area towards the entrance. Although the officer was supposed to patrol the walkway, he failed to do so on the day in question. Calderon was lying on his bed when four inmates threw a blanket over his face, held him down, and sodomized him for half an hour. The court found that the plaintiff had sufficiently pled "deliberate indifference" where he alleged that the defendants were

aware that the inmates were being housed without regard to their security needs and that the defendants knew that this practice was dangerous. The plaintiff sufficiently pled that the defendants disregarded these risks and failed to take measures to end this unsafe practice -- resulting in serious harm to the victim of abuse. Id. at 65-66.

In this case, Chao alleges that the prison conditions created a substantial risk of harm that was known to the defendants -- both in terms of the design of the prison and the training and supervision of the officers. In addition, they failed to investigate allegations of Ballista's sexual abuse.

The question for the fact-finder is twofold: (1) whether the defendants were actually aware of the conditions giving rise to the risk of serious harm to Chao and other female inmates; and (2) whether they disregarded that risk.

### a.        Awareness of Risk of Serious Harm

In this case, the plaintiff alleges that the defendants were deliberately indifferent to the structural conditions that might place her in jeopardy, and worse, to the red flags and actual allegations that were made about Ballista and Jackson.

### (1)        Prison Conditions

The defendants move for summary judgment on the grounds that they were unaware of any risks posed by prison conditions or the prison environment. But the facts -- again on a record taken in the light most favorable to Chao -- belie that claim. The prison transitioned from a male prison to a female prison without a significant change in staffing. Male guards, who had traditionally guarded male prisoners, were now in the position of guarding female inmates, who were particularly vulnerable to exploitation. See Flyn L. Flesher, Cross-Gender Supervision in Prison and the Constitutional Right of Prisoners to Remain Free from Rape, 13 Wm. & Mary J.

Women & L. 841, 844 ("In addition to being degrading, cross-gender supervision in women's prisons greatly increases the frequency of sexual abuse against female prisoners.") (cited in Pl.'s Opp. to Mot. Summ. J. at 14).

As in Calderon-Ortiz, Chao's claim is that the structure and policies of the prison may have led to substantial risk of harm. Inmates were particularly accessible to male guards. They were housed in rooms that were close to the offices of male officers, and their rooms had doors. There were few cameras throughout the prison[10] and plenty of areas where sex could occur undetected. The question for the fact-finder is whether these conditions created a substantial risk of serious harm.

Here, Chao need not show that there was a risk to *her* in particular or even that there was a risk of *Ballista* as offender: "[I]t does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such risk." Farmer, 511 U.S. at 844. It is sufficient that the defendants were actually aware of the risk of harm to women similarly situated.

And there is ample evidence to suggest that the defendants in this case were aware of these dangers. All three have significant experience and training -- both themselves and of others -- on issues related to female inmates.[11] Dennehy served as commissioner of the Department of Corrections as prison rape has gained more and more attention, in part due to the Prison Rape

_____

[10] Ryan testifies that she installed two cameras outside the building as a safety measure. Ryan Aff. ¶ 20.

[11] Although the defendants did not emphasize their separate roles in their Opposition to the Motion for Summary Judgment, they must be treated separately under the Eighth Amendment. At trial, the plaintiff must prove that each of them was deliberately indifferent to a significant risk of substantial harm. And in fact, their individual liability may vary according to whether a fact-finder determines that they were sufficiently close to the facts as to be found to be "actually aware" of the risk.

Elimination Act.[12]  In her deposition, she emphasized that improving prison safety necessarily reduces the risk of sexual violence.  Dennehy Dep. 42:5 - 43:23.  She also spoke of the impact of contraband and quid pro quo arrangements on prison safety.  Id.  Ryan in turn has taught a course on Female Offender Training, which included issues such as Staff Sexual Misconduct, Privacy Issues, Trauma, Medical and Mental Health Needs, and Gender Responsive Programming.  See Ryan Aff. ¶ 9.  In her affidavit, she articulated the safety concerns and dangers of officer-on-inmate sexual misconduct.  Id. ¶ 41 ("Any inappropriate conduct with an inmate committed during the course of employment by a DOC staff member not only subjects the staff member to extortion and undermines that staff member's ability to enforce any rule but also compromises the inmate in question leaving the inmate vulnerable as well as causes other inmates to feel resentment and a lack of trust of all staff.").  Similarly, as director of training, Tortora taught the three-day course on female inmate management, which emphasized inmate safety, including that officials should not get too close to inmates because inmates were particularly susceptible to abuse and male dependency.

But while Dennehy, Ryan, and Tortora were especially attuned to the safety of female inmates, Farmer requires that they actually drew inferences from the facts that the particular conditions at SMCC posed a significant risk of harm to female inmates.  It is not enough to show that they *should have known* of these conditions but rather, that they *actually did know*.  That bar is high.  See Farmer, 511 U.S. at 838 ("An official's failure to alleviate a significant risk that he

_____

[12] As commissioner, Dennehy was not actually present at the prison to hear the allegations about Ballista or engage in the investigations.  Nonetheless, the evidence presented by plaintiff is sufficient to suggest that she was aware of the safety risks and the structure of the prison and its staffing for purposes of this motion for summary judgment.

should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.").

### (2)     Actual Allegations

In the instant case, there were more than just structural conditions that might result in harm. There were actual allegations that arguably should have put the defendants on notice that significant sexual activity was occurring between guards and inmates within their walls. In spite of the dangers -- perceived and real -- of reporting sexual misconduct, inmates did report the conduct of Jackson and Ballista. As early as May of 2003, two different inmates told officers that they had seen -- with their own eyes -- Jackson kissing Rivera. And yet the investigation was inconclusive; Jackson remained at SMCC. Similarly, in March of 2004, the prison officers who investigated Ballista dismissed allegations that he too had sexual contact with Rivera, even though the reporting inmate told the officers that she had stood outside the door to keep watch while they were having sex. That reporting inmate was "shipped" to MCI-Framingham, the higher security prison, while the investigation was pending.

Here, granting the inferences in plaintiff's favor as I am obliged to do, there is sufficient evidence to suggest that Ryan, at the very least, was actually aware of the risks of sexual misconduct: she was *told*. And indeed a fact-finder might find it hard to believe that in a small institution that Ryan has said is more akin to a dormitory than a prison Ballista and Chao could have fifty to one hundred sexual encounters entirely undetected by any of the defendants. Given the summary judgment standard, there are ample facts to suggest that prison officials were aware of the risks but were turning a blind eye, disbelieving inmates, refusing to take sexual misconduct seriously -- the classic "deliberate indifference."

### b.    Good Faith Response

Still, the supervisory officials argue that they responded reasonably to these risks, an argument which may well prevail at trial.  If a jury agrees, the Eighth Amendment claim against them will fail.  See Burrell, 307 F.3d at 8.

Dennehy and Ryan maintain that they put in place appropriate safeguards to protect female inmates from harm, including scheduled and unscheduled rounds, restricting access to certain areas, installing windows in the doors of the inmate housing areas, installing shower curtains in the bathrooms, and mounting "two cameras" that Ryan "was able to take from the closing of MCI-Lancaster."  Ryan Aff. ¶¶ 20, 35.

Tortora describes training that was believed to be thorough and excellent.  Defense counsel at oral argument was incredulous that anyone would say otherwise.  Tortora conducted a three-day course on female offenders, including the particular vulnerabilities and risks of dependency.  Tortora Aff. ¶ 4.  "Read the training materials," counsel exhorted the court, "You must conclude that the defendants were not liable as a matter of law."

The argument is wrong on several counts.  First, the plaintiff has countered with expert testimony that I find to be relevant and helpful.  She has offered the report of Jacqueline L. Kotkin on the question of whether the training provided by the defendants was adequate to prevent or minimize the risk of sexual abuse within SMCC.  See Pl.'s Expert Rep.  The testimony suggests that the training was insufficient to help guards deal with female inmates who are particularly vulnerable to abuse and mental illness.  See Pl.'s Expert Rep.[13]

---

[13] The plaintiff argues that Ballista himself testified that the training was not effective:

Q:    Okay.  But nothing you were given in your training warned you of this kind of stuff?
A:    I mean, not really, I mean, not enough, not enough to actually apply it, I would say.

Defendants suggest that I should simply ignore the expert testimony, trivializing and dismissing it. In this regard, defendants cite to Torres v. Comm'r of Corr., 427 Mass. 611, 614 (1998), in which the SJC categorically rejected expert opinions as to the extent to which conditions caused inmates' psychological problems.

First, I fundamentally disagree with Torres' premise. Torres challenged the conditions in a unit known as the department disciplinary unit ("DDU") at MCI Cedar Junction. In the "DDU," apart from five hours of exercise weekly and three times weekly opportunities to shower and shave, inmates were confined to their seven by twelve foot cell. They could be sentenced to the DDU for up to ten years. Torres, 427 Mass. at 613. Torres argued that the conditions of their confinement violated the Eighth Amendment and Article 26 of the Massachusetts Declaration of Rights. Plaintiffs offered an affidavit of Dr. Stuart Grassian who opined that "the DDU's conditions of confinement can cause psychiatric harm." Id. at 614. The Court dismissed the expert's opinion, and sustained the lower court's grant of summary judgment for the defendants, holding that the opinion created no triable question of fact because "whether prison conditions are sufficiently harmful to establish an Eighth Amendment violation is a purely legal determination for the court to make." Id. at 614.

While the ultimate question of whether the conditions alleged in the case at bar and the harms that they bring about amount to an Eighth Amendment violation is a question of law (or more likely, a mixed question of law and fact), surely the data on which that conclusion must be

---

Q:      Not enough what?
A:      Not enough training to really apply. I mean, I was given -- I remember the one-day
         course. That's what I took from that and the rest of it was . . .

Dep. 117:23 - 118:8. That evidence is admissible only as against Ballista under Fed. R. Evid. 801(d)(2)(D).

based is a factual question. Just as a lay jury is assisted by expert evidence of what solitary confinement and sensory deprivation over an extended period of time does to a human being, likewise a jury is assisted by expert opinion about what kinds of training work to alleviate the risks of sexual abuse.

Second, expert testimony is particularly helpful in the instant case. Kotkin's affidavit outlines the training on rape offered by the defendants to correctional officers, and, based on her experience, opines why it is or is not adequate to prevent serious harm to inmates. The decision for the fact-finder is whether to accept her testimony, and to determine what weight to accord it.[14]

I have read the training materials, as I have read all parts of the record. Notwithstanding counsel's exhortations, the conflicting accounts of the sufficiency of training raise a triable question of fact.

The defendants also maintain that the investigation of this particular officer was appropriate and thorough, and that I should so rule, as a matter of law. Ryan testified that she first heard of the rumors of Chao and Ballista by an incident report submitted by Ballista himself. An investigator spoke with Ballista and reinforced SMCC norms and protocols. At the time, Ryan believed that it was simply a rumor that was handled appropriately by Ballista and the staff. Ryan Aff. ¶ 42. She felt the same way about two subsequent reports filed by Ballista himself and believed that he was merely exercising good judgment. When Chao herself reported rumors about their relationship and denied them, Ryan again believed her. It was not until she received information from a third party, another inmate, that she became concerned and ordered the first formal investigation, which found the allegations to be unsubstantiated. When authorities then

---

[14] To be sure, the defendants mentioned potential issues under <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 516 U.S. 869 (1995), which I do not address here.

received an anonymous letter from an inmate at MCI-Framingham in effect corroborating these accounts, Ryan ordered yet another investigation. Finally, as part of this investigation, Chao admitted to their sexual relationship. Id. ¶ 56. Ballista was criminally charged.

The defendants were conscientious, Ryan argues, and launched two full investigations that ultimately resulted in the termination of the wrongdoer. They responded to the risks as they became aware of them, even if they did not ultimately protect Chao from ongoing sexual misconduct. As such, they are not liable under the Eighth Amendment for the harm. Burrell, 307 F.3d at 8.

That may be so, but there is surely a triable question of fact as to whether the supervisory officials did respond in good faith to the specific allegations of sexual misconduct when they arose. Here, prison officials -- including Ryan -- dismissed eye-witness accounts of inmates as mere "rumors." See Ryan Aff. ¶ 42. (Indeed, Ryan's counsel did the same thing at oral argument. He went so far as to insinuate that one should expect such rumors from women and presumably discount them.[15]) That approach is hardly conducive to addressing the risks of inmate sexual abuse. In a prison where male guards have absolute control and female inmates are especially vulnerable, where guard-inmate sexual encounters are obviously not conducted in the open, a

---

[15] From the transcript of the hearing on Wednesday, March 9, 2011:

> MR. DEITRICH: Kelley Ryan says in her affidavit, this is an institution filled with women, without sounding sexist about this but there is a whole different dynamic about that.
> THE COURT: Absolutely.
> MR. DEITRICH: Which involves among other things rumors being spread having nothing to do with the truth. I'm saying not only does she have to separate wheat from chaff on those rumors she's not even getting the rumors as to those five individuals.

good faith response to inmate allegations does not mean summarily discounting them as defense counsel suggests.[16]

More troubling, the defendants make much of the fact that when asked, Ballista and Chao denied the allegations. The position is not compelling. If prison officials were to investigate drug abuse and they had eye witness accounts, would they be satisfied if the inmate -- or guard in this case -- simply denied using drugs? Sex between inmates and staff is prohibited; it should not come as a surprise that the parties would hide it.

And for inmate Chao, this is especially the case. It is now well known that there is often delayed reporting of sexual abuse. See Paramasamy v. Ashcroft, 295 F.3d 1047, 1053 & n.3 (9th Cir. 2002) ("That a woman who has suffered sexual abuse at the hands of male officials does not spontaneously reveal the details of that abuse to a male interviewer does not constitute an inconsistency from which it could reasonably be inferred that she is lying. Indeed, the assumption that the timing of a victim's disclosure of sexual assault is a bellwether of truth is belied by the reality that there is often delayed reporting of sexual abuse.").

In short, there are two plausible stories here. A fact-finder could determine that Dennehy, Tortora, and Ryan acted reasonably and did everything that they could to protect inmates from harm. Or the fact-finder could find that the defendants failed to adequately train their staff and allowed at least two sexual predators to run rampant, to coerce sexual favors, to revictimize women who were already vulnerable, exhibiting precisely the kind of "deliberate indifference"

---

[16] Indeed, the Department of Corrections Staff Sexual Misconduct Policy requires that all allegations of staff sexual misconduct be investigated. An "allegation" includes: "any event that is said to have happened but which has not yet been verified. These include rumor and inmate talk." See Pl.'s Expert Rep. at 8 (quoting Policy 103 DOC 519).

envisioned by the Eighth Amendment. I will -- as I must -- allow the jury to hear the evidence and weigh the credibility of the witnesses.

### C. Qualified Immunity

Finally, the supervisory officials argue once again that they are entitled to qualified immunity because they were not "deliberately indifferent" to the risks to Chao's rights and safety. Their argument, however, goes to the merits of their claim rather than to qualified immunity. Whether the defendants are entitled to qualified immunity is not a matter of whether they were in fact deliberately indifferent but rather whether a defendant in their position would have reasonably so believed. As I said in the Order on the Motion to Dismiss, the defendants were certainly on notice that sexual misconduct between guards and inmates was absolutely prohibited and subject to criminal prosecution. See Mem. & Order, July 9, 2009, at 11 (document #54); Schwenk v. Hartford, 204 F.3d 1187, 1197 (9th Cir. 2000) ("In the simplest and most absolute terms, the Eighth Amendment right of prisoners to be free from sexual abuse was unquestionably clearly established . . . and no reasonable prison guard [or prison official] could possibly have believed otherwise."). On this record, they were arguably aware of the "red flags" signaling an improper relationship between Chao and Ballista. They are therefore not entitled to qualified immunity.

Because sexual misconduct may rise to the level of seriousness required for an Eighth Amendment violation, and because there is a triable question of fact as to whether these defendants were "deliberately indifferent," I DENY summary judgment to all the defendants on Chao's constitutional claims.

## IV. MASSACHUSETTS CIVIL RIGHTS ACT (MCRA)

The plaintiff further claims that the defendants violated the MCRA by interfering with her civil rights, including her substantive right to bodily integrity and her equal protection right to be free from sexual abuse. The MCRA provides a cause of action:

> Whenever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation to coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth.

Mass. Gen. Laws ch. 12 § 11H. To establish a claim under the MCRA, the plaintiff must show that "(1) their exercise of enjoyment of rights secured by the Constitution or the laws of either the United States or the Commonwealth, (2) have been interfered with or attempted to be interfered with, and (3) that the interference or attempted interference was by threats, intimidation or coercion." Id. § 11I. Both sets of defendants move for summary judgment on the grounds that there were no threats, intimidation or coercion.

A.     Ballista

Here again, the case against Ballista is straight-forward. Considered in the light most favorable to the plaintiff, the facts reveal a coercive relationship in which she serviced him multiple times every night towards the end of their encounters. As a prisoner, she was by definition "captive" and had no real means of declining. He had full access to her room. He coerced her with the additional benefit of talking to her children with his cell phone or the privilege of keeping contraband. And implicit in this relationship -- as she describes -- was the threat of what would happen if she refused.

This was an environment where Ballista had absolute control and access. He had physical control over her and her surroundings, and he had control over her access to the outside world, including to her children. These facts certainly raise an inference of coercion sufficient to survive summary judgment.

Ballista's motion for summary judgment as to the MCRA claim is DENIED.

### B.     Dennehy, Ryan and Tortora

While it is true that the plaintiff's rights to bodily integrity were interfered with, it is not clear that these supervisors are responsible for threats, intimidation, or coercion. The plaintiff argues in opposition to summary judgment that Chao was "indirectly threatened" by DOC security that she would be sent to a more secure facility and locked in solitary confinement if she were to admit to having sex with a guard. Indeed, it was "common knowledge" that inmates who reported offenses were "shipped back" to Framingham, including Chao's fellow inmate, Citron, who first reported Ballista's sexual misconduct.

While this is troubling, the plaintiff has produced no authority that this kind of indirect threat amounts to a violation of the MCRA. Accordingly, summary judgment is GRANTED to the supervisory officials on the MCRA claim.

## V.     TORT CLAIMS AGAINST BALLISTA[17]

In addition to her Eighth Amendment and MCRA claims, Chao brings several tort claims against Ballista, including assault and battery, negligence, wanton and reckless conduct, and negligent or intentional infliction of emotional distress. Ballista has moved for summary

---

[17] The tort law claims against the defendants Dennehy, Ryan, Azzato, Tortora, and the Massachusetts Department of Corrections were dismissed on October 24, 2008. See Mem. & Order Re: Motion to Dismiss, Oct. 24, 2008 (document #36). The claims against defendant Ballista remain.

judgment on the grounds that each of these claims is barred because Chao consented to the sexual relationship. As I have said, Chao's "consent" or lack thereof is a question of material fact not to be determined on summary judgment. Nonetheless, I will consider each claim briefly below.

A.    **Assault and Battery**

Chao claims that Ballista committed the intentional tort of assault and battery. Battery is offensive, unwanted, or harmful touching. Com v. Gorassi, 432 Mass. 244, 248 (2000). And assault is either attempted battery or an overt act that places someone in fear of an immediate battery. Id.

In this case, the defendant alleges that Chao's claim against him for assault and battery is barred because she consented to his touching. In other words, the contact was not offensive or unwanted. It is true that consent is an absolute defense to tort claims alleging assault and battery. Thibault v. Laumiere, 318 Mass. 72, 74 (1945) (holding that where a person consents to engaging in consensual sexual conduct with another, she is barred from recovering on claims of assault and battery). As I have already said, however, consent is deeply contested here. By at least May of 2004, Chao no longer wanted to engage in any sexual activity with Ballista. I find that there is a triable question of fact as to whether Chao indeed consented to Ballista in the prison context under these circumstances.

Accordingly, I DENY summary judgment to Ballista on the assault and battery claim.

B.    **Negligence**

Chao next brings a claim against Ballista for negligence. To prevail on a claim of negligence, a plaintiff must show (I) that the defendant owed a duty of care to the plaintiff; (ii) that the defendant breached that duty; (iii) resulting in damages; (iv) that were caused by the

breach.  Lev v. Beverly Enterprises-Massachusetts, 457 Mass. 234, 240 (2010).  Here, Ballista owed Chao the duty of care of a jailer, which includes "protect[ing] her against unreasonable risk of physical harm."  Slaven v. Salem, 386 Mass. 885, 887 (1982).

The defendant here again argues that because Chao consented to their sexual encounters, she did not suffer any unreasonable harm nor did Ballista breach any duty of care.  As I have said, there is a triable question of fact as to whether Chao did consent or suffer from the unreasonable risk of physical harm.  Summary judgment is DENIED on this claim as well.

### C.      Wanton or Reckless Conduct

Chao further claims that Ballista is liable of wanton or reckless conduct.  Wanton or reckless conduct is defined as "intentional conduct, by way either of commission or of omission where there is a duty to act, which conduct involves a high degree of likelihood that substantial harm will result to another."  Commonwealth v. Earle, 458 Mass. 341, 347 (2010) (internal quotations omitted).  The actor's conduct must involve a risk of "death or grave bodily injury." Montes v. Mass. Bay Transp. Auth., 446 Mass. 181, 185 (2006).  Here, a reasonable fact-finder could determine that Ballista's sexual conduct with Chao -- and in particular his use of gloves or plastic bags as prophylaxes while he was having sex with multiple partners -- involved a risk of grave bodily injury.  Therefore, summary judgment is DENIED on the wanton or reckless conduct claim.

### D.      Negligent or Intentional Infliction of Emotional Distress

Finally, Chao brings a claim against Ballista for negligent or intentional infliction of emotional distress.  A claim for negligent infliction of emotional distress requires a showing of "(1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective

symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case." Gutierrez v. Mass. Bay Transp. Auth., 437 Mass. 396, 411-12 (2002). Thus, a plaintiff alleging negligent infliction of emotional distress must show physical harm and not just "mere upset, dismay, humiliation, grief and anger." Id. at 412 (internal quotations omitted).

To prevail on a claim for intentional infliction of emotional distress, the plaintiff must establish: "(1) that the defendant intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of his conduct, but also (2) that the defendant's conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community, (3) the actions of the defendant were the cause of the plaintiff's distress, and (4) the emotional distress suffered by the plaintiff was severe and of such a nature that no reasonable person could be expected to endure it." Tetrault v. Mahoney, 425 Mass. 456, 466 (1997).

In this case, Ballista again argues that their relationship was consensual and certainly did not rise to the level of extreme and outrageous conduct; she could not suffer harm from a consensual relationship. But here again there are triable questions of fact, including whether Ballista intended to cause distress, whether initiating a sexual relationship with an inmate amounted to extreme and outrageous conduct in a prison setting, and whether Chao suffered physical harm as the result of her relationship with Ballista or distress to a degree that no reasonable person could be expected to endure.

Summary judgment is therefore DENIED on the emotional distress claims.

## VI.    CONCLUSION

For the reasons stated above, I **DENY** Ballista's Motion for Summary Judgment (**document #100**); I **GRANT in part and DENY in part** Dennehy, Ryan, Tortora and Azzato's Motion for Summary Judgment (**document #97**); and I **DISMISS all claims against Randy Azzato.**

**SO ORDERED.**

**Date:  March 25, 2011**          */s/ Nancy Gertner*
                                   **NANCY GERTNER, U.S.D.J.**