**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **CRISTINA CHAO,**<br>    **Plaintiff,** | ) |
| | ) |
| | ) |
| **v.** | )   **Civil Action No. 07cv10934-NG** |
| | ) |
| **MOISES BALLISTA; KELLY RYAN, Superintendent** | ) |
| **of South Middlesex Correctional Facility** | ) |
|     **Defendants.** | ) |

**GERTNER, D.J.:**

## TABLE OF CONTENTS

**MEMORANDUM AND ORDER RE:**
**MOTIONS FOR JUDGMENT AS A MATTER OF LAW**
**NOTWITHSTANDING THE VERDICT OR FOR A NEW TRIAL**
**July 28, 2011**

I.   BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-
     A.   Chao's History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-
     B.   Chao and Ballista . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-
     C.   Prison Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -10-
          1.   Transition to a Female Prison . . . . . . . . . . . . . . . . . . . -10-
          2.   Sexual Environment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-
          3.   Reporting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -13-
          4.   Rumors and Investigations . . . . . . . . . . . . . . . . . . . . . . . -15-
     D.   Harms of Sexual Misconduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-
          1.   Risks of Sexual Misconduct in Prison . . . . . . . . . . . . . -17-
          2.   Harm to Chao . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

II.  SUFFICIENCY OF THE EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-
     A.   Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-
     B.   Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -21-
          1.   Eighth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -22-
               a.   Sufficiently Serious Harm . . . . . . . . . . -22-
               b.   Deliberate Indifference . . . . . . . . . . . . -26-
                    (1)   Ballista . . . . . . . . . . . . . -26-
                    (2)   Ryan . . . . . . . . . . . . . . . -27-
          2.   MCRA Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -31-
          3.   Intentional Infliction of Emotional Distress . . . . . . . . -33-

III. QUALIFIED IMMUNITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -34-

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -39-

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CRISTINA CHAO,<br>    **Plaintiff,**<br><br>    **v.**<br><br>**MOISES BALLISTA; KELLY RYAN, Superintendent**<br>**of South Middlesex Correctional Facility**<br>    **Defendants.** | )<br>)<br>)<br>)  **Civil Action No. 07cv10934-NG**<br>)<br>)<br>)<br>) |

**GERTNER, D.J.:**

**MEMORANDUM AND ORDER RE:**
**MOTIONS FOR JUDGMENT AS A MATTER OF LAW**
**NOTWITHSTANDING THE VERDICT OR FOR A NEW TRIAL**
**July 28, 2011**

Moises Ballista ("Ballista") and Kelly Ryan ("Ryan") renew their motions for judgment as a matter of law notwithstanding the verdict, or in the alternative, for a new trial.

Over the course of more than one year, Cristina Chao ("Chao") and a prison guard, Moises Ballista ("Ballista"), had fifty to one hundred sexual encounters in twenty-three places all over South Middlesex Correctional Center ("SMCC") in Framingham, Massachusetts, where she was incarcerated.  In spite of eye-witness reports from other inmates that at least two guards were engaging in sexual misconduct with inmates as early as May 2003, no efforts were taken to stop the misconduct until July 2004.  Ballista was suspended, and later convicted of sexual relations with an inmate, a crime against public justice in violation of Mass. Gen. Laws ch. 268 § 21A.  Surveillance cameras were installed after the fact.

Upon release from prison, Chao brought this 42 U.S.C. § 1983 action against Ballista and department of corrections officials for damages arising from the sexual misconduct.  She claimed that Ballista violated her federal and state constitutional rights by sexually exploiting her while she was incarcerated under his supervision.  She also brought several tort claims against Ballista, including assault and battery, negligence, wanton and reckless conduct, and negligent or

intentional infliction of emotional distress.  She claimed that the prison officials failed to protect her from sexual abuse in violation of the Eighth Amendment by failing to adequately train their officers, failing to investigate allegations of abuse as they arose, and failing to provide institutional safeguards (as in surveillance cameras) to protect female inmates.  After summary judgment, only Chao's claims for failure to protect her survived against Ryan, Superintendent of SMCC, and Kathleen Dennehy ("Dennehy"), Commissioner of the Massachusetts Department of Corrections.

After nine days of trial and three days of deliberations, the jury returned a verdict.  As to Ballista, the jury found that Ballista did intentionally inflict emotional distress upon Chao; that Ballista violated her right to be free from cruel and unusual punishment by means of threats, intimidation or coercion (under the Massachusetts Civil Rights Act); that Ballista violated Chao's Eighth Amendment right to be free from cruel and unusual punishment (under § 1983) and that Ballista's conduct was intentional, willful, wanton or malicious.  Verdict Slip (document #170). The jury found that Ballista did not assault or batter Chao, and that his conduct with Chao was not wanton or reckless and likely to result in bodily injury.  Id.

As to the supervisory officials, the jury found that Ryan had violated Chao's Eighth Amendment right to be free from cruel and unusual punishment; but that Ryan's conduct was not intentional, willful, wanton or malicious.  Id.  As to Dennehy, the jury found that Dennehy did not violate Chao's Eighth Amendment right to be free from cruel and unusual punishment.  Id. The jury awarded $67,500.00 in damages joint and severally as against Ryan and Ballista, and $6,200.00 in punitive damages against Ballista.  Id.

Each of the defendants moved for directed verdict, which the Court denied.  Ballista and Ryan now renew those motions on several grounds -- that the jury's verdict was inconsistent and that there was insufficient evidence for the various claims against the defendants.  In addition, the defendants renew the claim, which they pressed without success at summary judgment, that consensual sex between a guard and an inmate is not a violation of the Eighth Amendment as a matter of law.  See Chao v. Ballista, No. 07-10934, 2011 WL 1097416, ___F. Supp. 2d ___ (D. Mass. Mar. 25, 2011).  Ryan also argues that she is entitled to qualified immunity.  She argues that an inmate's right in these circumstances is not so clearly established such that a supervisory official may be personally liable for its violation.

I will address each of these arguments in detail below.  I pause to note, however, that the jury's verdict is entirely consistent with the trial record in this case.  The defendants have argued that Chao, even though a prisoner, had consented to the sex and that the consent negated any finding of serious harm.  As such, they argued, a jury could not possibly find that there was no "assault and battery" and yet find a violation of the Eighth Amendment.  The plaintiff countered that inmates cannot consent as a matter of law -- and that *all* sex is a per se violation of the Eighth Amendment.

The jury's verdict belies both contentions.  As I noted in refusing to hold on summary judgment that a prisoner's arguable consent *as a matter of law* vitiated the possibility of serious harm under the Eight Amendment:  "Sex in prison is a complex and risky phenomenon; 'consent' is not easy to determine amidst the power dynamics between male captors and female inmates." Id. at *8.  The analysis is contextual -- and for the fact finder.  An inmate may acquiesce to sexual encounters with a guard -- such that they would not meet the formal requirements for

assault and battery -- and yet those sexual encounters may nevertheless be coercive and intimidating under the circumstances.[1]  Indeed, where, as here, the "relationship" between this inmate and her captor took place over the course of a year, where virtually every encounter was one sided female-on-male fellatio, where he sometimes woke her up the middle of the night to "service" him, the jury could reasonably find that the conduct rose to the level of serious harm required to constitute a violation of the Eighth Amendment.

## I.   **BACKGROUND**

Post-trial, I must consider the facts in the light most favorable to the verdict.  Raiche v. Pietroski, 623 F.3d 30, 35 (1st Cir. 2010).  That the jury returned a verdict in favor of the plaintiff on some claims and in favor of the defendants on others does not negate this process. See, e.g., id.  The Court will simply consider the facts in the light most favorable to each of the jury's findings.  Where it is alleged that a jury's findings are inconsistent, it is the duty of the court to attempt to reconcile or "harmonize" their findings so long as "it is possible under a fair

---

[1] As I indicated:

> I will not say, as some courts have apparently said (mainly when the inmate is male and the guard female) that a prisoner's arguable consent ends all Eighth Amendment inquiry.  As I describe below, a relationship between an inmate and a guard is presumptively coercive.  Each of the so-called indicators of consent emphasized by defendants could as well mean the opposite; she does not disclose the relationship or denies it when asked precisely because of her vulnerability to the guard's retaliation; she continues the relationship without making a formal complaint, not because she wants to but because she is afraid to stop it, not unlike a woman suffering from domestic abuse.  And the relationship necessarily risks serious psychological harm to the inmate - particularly where female inmates tend to be especially vulnerable to abuse.  It surely may cause the kind of serious harm envisioned by the Eighth Amendment no matter how rosy its veneer.  But the issue on summary judgment is not an abstraction. Whether the relationship was coercive *in this case*, whether it caused constitutional harm to *this plaintiff* is a matter for a fact-finder, not for a judge.

Chao, 2011 WL 1097416, at * 2.

reading of them."  Gallick v. Baltimore & Ohio R.R. Co., 372 U.S. 108, 119 (1963).  Wherever possible, the court is to give effect to the jury's verdict.

### A.      Chao's History

Like many female inmates, Chao was a victim of sexual abuse both as a child and as an adult.  She testified that the abuse began at nine years old, when she was molested by her stepfather's grandfather.  When she told a counselor at school as part of a "good touch / bad touch" seminar, they called her mother.  Her stepfather's grandfather was prosecuted and convicted, but was later released on probation and allowed back into their home.  Chao testified that she felt like she was not protected.  She was angry and confused and started to act out -- eventually running away.  She was placed in a series of foster homes but eventually ran away from those as well.

Chao's first sexual intercourse was forcible rape at the age of fourteen by a man who was twenty-seven.  She said that she felt "disgusting."  She did not tell anyone because "nothing happened last time [she] told someone."

A year later, at the age of fifteen, she met a man named Perry, three years her senior.  She ran away from the foster home in which she was then living and stayed with Perry in his apartment.  At the age of sixteen, she became pregnant with Perry's son.  At the same time, Perry was arrested for drug dealing; she was left alone to raise their baby.

In short order, she became involved with another man, Anthony, and became pregnant again.  He too went to jail for drug dealing while she was pregnant with his daughter.  Chao was then seventeen.

Meanwhile, Perry, now out of jail, asked to live with Chao again.  He was the father of their child; she believed that he should be home with her.  This time, however, he became abusive.  Chao testified, "He hit me all the time, choked me.  At one point he put a gun to my head when I told him I didn't want to be with him and he told me he would kill me before he would let me leave or be with somebody else . . . I was terrified. . . . I mean, I couldn't fight him off.  I was afraid he would kill me."

Perry was again arrested for drug dealing.  He called Chao from jail and told her that he needed money for bail.  He told her that she should not only collect money from his previous drug deals, she should continue dealing on his behalf.  Until this point, she had never dealt or used drugs.  But she relented, doing as she was told.  She sold drugs for about two months before her house was raided and she was arrested -- the offense for which she was ultimately serving time at SMCC.  She later learned that it was Perry who had informed the authorities, likely in exchange for a plea deal.

After nine months at Ludlow and then Pittsfield House of Corrections, Chao pled guilty to drug trafficking.  She was sentenced to four to five years in State Prison and sent to MCI-Framingham.  Trial Ex. A, Psychiatric Evaluation of Cristina Chao, Jan. 25, 2011 ("Psych. Eval.") at 5.  She spent eighteen months at MCI-Framingham and was then transferred to SMCC in the spring of 2003.  Id. at 6.

SMCC had only recently been converted to an all women's institution.  As the evidence suggested (see infra Part I(C)), the transition was far from smooth.  But whatever its limitations, the SMCC was a place in which the inmates enjoyed significantly more freedom.  They had rooms, not cells.  Id.  And more important, they were allowed more time to visit with their

children.  Children did not have to go through metal detectors.  Chao testified that the "biggest

difference was the trailer visits," where children could spend the weekend with their mother in a

trailer with bedrooms and a kitchen:  "[Y]our children don't see the officers, you cook for them,

you clean with them, you tuck them in bed, you read them stories, you get to reconnect with

them after being away from them so it was a big deal."

### B.    Chao and Ballista

Chao met Ballista shortly after she arrived at SMCC.  He was the officer assigned to her

floor.  Ballista was friendlier than other guards, and the two of them began talking and flirting.

They talked about their families, where they were from.  She told him about the relationships in

her past -- including the sexual abuse.  She worked in the kitchen in the mornings, and he would

wake her up to make sure that she was on time.  Regarding their initial encounters, she testified,

> I just thought it was a friendship.  I thought he was being nice and
> it was refreshing after being in a facility where, you know, you're
> looked at, you're looked down upon, you're an inmate, they think
> they're better than you.  You're kind of like a caged animal.  You
> don't feel worth too much, and he was nice.  He talked to you, he
> made you feel normal.

On July 5, 2003, he asked her to meet him in the gym.  She was sitting on a bench when

he approached her and put one of his legs in between her legs.  He asked what she wanted to do,

and she shrugged.  He told her to come with him and took her to a supply room.  Then he

unzipped his pants and pulled out his penis.  He sat on a chair and called her to him.  She

performed fellatio; he pulled out a rubber glove and ejaculated into it.  Trial Ex. 15, Chao's

Written Statement at 1-2.  This was the first of fifty to one hundred sexual encounters between

Chao and Ballista over the next year -- in at least twenty-three different places in the small

prison.  He often used rubber gloves for "protection," and on one occasion he used a plastic bag

that broke during intercourse.  After that incident, Chao began to use birth control pills -- telling the prison nurses that she suffered from migraines -- but she and Ballista never had intercourse again.

Throughout their "relationship," Ballista enticed Chao with extra benefits.  He told her when her room was going to be "tossed" or searched so that she could make sure she had no contraband.  He took contraband (tongue ring, tweezers) home for her and then brought it back whenever a "toss" was over.  He mailed letters for her and allowed her to use his cell phone to talk with her children.  Psych. Eval. at 6.

Chao testified that there was a time when she had feelings for Ballista:  "Things got more intense, and at one point I thought I had feelings for him. . . . I know now even to this day I can confuse sex with feelings. . . . I didn't realize I was being taken advantage of.  I didn't realize that it was a game."  She even requested to be in a drug rehabilitation program in part so that she could be placed on his floor.  At one point, he told her that he could not continue the relationship.  He said that he knew he was taking advantage of her, that he did not want to hurt her.  They temporarily stopped the sexual encounters.  Chao conceded that she was upset.

But the cessation did not last long.  A month later, Ballista came to her while she was cleaning a visitor's bathroom -- in the middle of the day -- and shut the door.  He undid his pants and revealed himself to her; she again performed fellatio.[2]  They resumed their sexual encounters.

---

[2] As to this encounter, counsel asked, "Were you afraid of anything?"  She answered, "Yeah, it was a very close place to where people were, I was afraid that someone could have seen him coming in or me coming out with him.  It's hard to explain walking out of a bathroom that is not a bathroom that an inmate or an officer should be in together . . . A visitor's bathroom is for visitors and inmates are not allowed to use it."

However she felt at the beginning of their relationship, there came a time when she knew that she was being "used."  By May 2004, the relationship had become more and more one-sided. He was coming to her room two or three times in one night for her to perform fellatio.  She testified:

> I wanted it to end.  I didn't know how to stop it. . . . I wanted it to end because it was very clear to me I was being used.  Like I said it was maybe five times that we had intercourse out of 100 times that I gave him oral sex.  There's nothing, that's not a relationship, that's being used.  It's being degraded.  It's dirty.  It's not what I wanted. . . . I am very ashamed.

She cried after each of his visits, and she would sometimes act as if she was sleeping when he entered her room.  Trial Ex. 15, Chao's Written Statement at 12.

Chao never did say "no."  She testified that she did not know how.  She testified that she neither consented nor refused:  "I did not consent or not consent, I just did what I was told to do."  On cross examination, Chao was asked:

> Q.      You could have told him no, correct?
> A.      If you think I could have told him no, I don't think I could have told him no.
> Q.      I'm just asking for a yes or no.
> A.      No, I couldn't have told him no.
> Q.      But you never told him no?
> A.      I just said I couldn't tell him no.

This was an environment, she said, where you do what you are told:

> I'm an inmate, I'm supposed to do what I'm told to do.  If I'm told to mop the floors, I mop the floors, if I'm told to remake my bed because it's not made well enough, I make the bed, and if I don't do what I'm told to do, there's consequences to not doing what you're told to do.

### C.    Prison Conditions

#### 1.    Transition to a Female Prison

As Chao testified, SMCC is a relatively small minimum security facility that is akin to a college dormitory.  The jurors saw a video tour, guided by Superintendent Ryan, that showed a well-kept, clean facility.  It had only recently been converted from a male to a female prison.  It was converted in 2002, shortly before Chao was transferred there.  At the time of the transition, few staffing changes were made, and only a third of the staff was female.  All staff underwent three days of "female offender training," where they learned about the particular needs of female inmates.  They learned, for example, that like Chao, many inmates have personal histories with physical or sexual violence and are prone to revictimization.  But Ballista, at the very least, testified that he did not remember much of this training -- except that any sexual contact with the inmates was strictly prohibited and in fact illegal.

Few physical changes were made to the building.  Shower curtains were added to the dressing areas in the bathrooms, but the bathroom urinals were left in place.  One camera was installed outside the premises -- the only surveillance camera on the property.  (Cameras were installed throughout the facility one year after these events transpired.)

During the night shift there were only two to four guards on duty.  One guard would be placed on each floor -- unsupervised -- to monitor the halls.  The inmates' doors were unlocked during this period.

### 2.      Sexual Environment

Three former inmates and two guards testified at trial that the prison had a highly-charged sexual environment.  There were few guards, and at least two of them -- Terrence Jackson ("Jackson") and Ballista -- were having sexual contact with many female inmates.  The flirtation was not one-sided; female inmates flirted with the guards.  Ethel Jones ("Jones"), an inmate, testified, "You have men, you have a bunch of women, and 9 times out of 10 the women are overtly flirtatious and sexual because I'm not saying it's anyone's fault, but, they don't see men very often and it's kind of how it goes, you know.  That's just how it is."  Indeed, around the same time as Ballista's misconduct, a scandal broke out at the police barracks when authorities discovered that civilian staff at the police department were engaging in sexual contact with female inmates on work crew from SMCC.

Interviews as part of the investigations into sexual misconduct at SMCC revealed that inmates "kept the peek," meaning they stood watch, while guards had sexual encounters with inmates.  Trial Ex. 12, Investigation Report, July 28, 2004, at 10.  Inmates referred to the Horticultural Room as the "Hotel."  Id. at 14-15.  Sexual contact also took place in the kitchen and in closets.  One inmate said that "all the inmates knew" about Chao and Ballista.  Trial Ex. 13, Investigation Report, Sept. 14, 2004, at 4.  It was apparently also well-known that Ballista had sexual contact with multiple inmates.  An inmate told investigators that girls had "story time" when they gossiped about Ballista's penis and the fact that it was discolored.  Id.

Indeed, Ballista conceded that he had sexual relationships with five inmates, some of them at the same time.  In addition to Chao, two of the these inmates, Jones and Tuwanda

Bowles ("Bowles") testified at trial.  Jones testified that Ballista called her into the library, locked the door and exposed himself.  She refused and did not report it.  She said that she was not surprised that a guard would do such a thing: "I was surprised that he did it, not that a guard did it, don't misunderstand what I'm saying.  It's not surprising to me that they do that, they've done it, a lot of them do it."  The court asked, "In other words, were there other guards that came onto you like that?"  To which Jones replied, "Yes, Yes."

Bowles reported that Ballista started flirting with her by getting her mail, and making sure that she got what she needed.  He would let her mom and sister bring food and personal belongings.  She thought that he was just being nice.  One day, he had her go down to the gym. They went into a dark supply room, and he pushed her head down.  She performed fellatio.  She testified that she did it "because he told [her] to."  She said,

> Q.   Why didn't you say no?
> A.   I grew up in the system and usually when something happens,
>      it's your fault, it's never the person's fault who's in authority,
>      it's your fault.
> Q.   Did you feel like you could say no?
> A.   No.
> Q.   Why not?
> A.   You don't say no to someone that's in authority, and, besides,
>      he had done all these other things for me, and I felt okay, is
>      this the reason why he was doing it because he expected
>      something in return.

Over the course of the next six months, she performed fellatio on Ballista five or six times.

Ballista fondled inmates openly.  Jones testified that she saw him approach her friend Cathy in the open hallway, grab her head and put it in his crotch.  Bowles testified that she was speaking with another inmate when he came up behind her and grabbed her breasts.  On another occasion, female inmates met Ballista in the shower to take naked pictures of themselves.  He

took some of the photos and had them developed.  He looked at the pictures in front of the inmates, and then gave the pictures to them.  Chao was not involved in this incident.

### 3.     Reporting

Jones, Bowles, and Chao testified that they did not report Ballista's conduct because they feared that they would be "shipped" -- or transferred -- back to MCI-Framingham.  And indeed, from 2003 to 2004, at least three female inmates *were* sent to Framingham when they reported sexual misconduct, including Wanda Cintron ("Cintron"), who first reported Ballista's conduct.

Bowles testified that she was interviewed by a security officer who told her that if they found out that anything was going on with Ballista, they would send her to Framingham while the investigation was pending.  She denied any sexual encounters because she did not want to get returned "behind the wall" (to MCI-Framingham).  She did not want to go back because she did not want to lose privileges and in particular, SMCC's more lenient program for visits with her children:

> Q.    And why didn't you want to get shipped back to
>        Framingham?
> A.    Because at that time my daughter was little, and my son
>        was pretty young then, too, and when you have visits in
>        Framingham, they usually have to check diapers, and, you
>        know, pat the kids down before they can come in, and
>        when you have visits in the prerelease, the kids can just
>        come right in, and you come down, and it's not too much of
>        a hassle for them to come into the facility.  I got to have
>        overnight visits with my daughter, and I didn't want to lose
>        that.  I felt like I earned the right to be there, I didn't get
>        into any trouble, and I wasn't going to let them take it from
>        me, so I didn't say anything.
> Q.    Did you feel like you had to go along with his sexual
>        demands to keep your rights?
> A.    Yes.

-13-

Similarly, Jones testified that she did not report Ballista's misconduct because she "wanted to go home, [she] did not want to go back to Framingham." She understood that if she were to report an incident, the Department of Corrections ("DOC") would send her back to Framingham and put her in a "closed custody unit . . . a small room about maybe the size of [a] desk, just a toilet, a bed, the mattress about that thin." She continued, "No one wants to go there [] especially when you were wronged and you get treated like you did something wrong."[3]

Chao was asked repeatedly whether she was engaging in a sexual relationship with Ballista; each time, she denied it. She said that she feared being "shipped" away. As is described below, she finally disclosed the sexual encounters when she was questioned by officers from Internal Affairs, an independent DOC investigation arm, and they guaranteed that she would not be transferred. They also promised that when she returned to the facility Ballista would no longer be there.

The policy that inmates who report sexual misconduct are sent to Framingham had a chilling effect. Dr. Jacqueline L. Kotkin ("Dr. Kotkin"), the plaintiffs' corrections expert, testified that because an inmate would lose all of the benefits of the lower security prison -- more important, better quality child visits, as Bowles noted -- she and her fellow inmates would perceive such a policy as retaliation. As a result, they simply would not make reports.

––––––––––––––––––––

[3] Jones also felt as though the investigators did not actually want her to tell the truth. Investigators came to talk with her in the summer of 2004 -- presumably as part of the investigation about Ballista -- when Jones had already been released on probation. When they asked her about sexual misconduct with officers, they told her that she would have to go back and complete a full year at SMCC if she were found to have been at fault. Counsel asked, "What did you understand that to mean? What did you think they were saying to you?" To which Jones replied, "Basically just to say I did not know anything, I did not see anything, I had no knowledge of anything, just to, you know, basically to say I have no knowledge of anything because if I did say that I was knowledgeable of it then I would be going back to jail."

### 4.      Rumors and Investigations

Despite the fear of being transferred, inmates -- and staff -- eventually did report Ballista and Jackson's misconduct.

Superintendent Ryan was first notified that there were rumors about staff sexual misconduct on February 8, 2003 when Ballista himself sent an e-mail about "rumors" regarding himself and an inmate to Jeffrey Reger ("Reger"), an Internal Perimeter Security ("IPS") officer. Ballista testified that he intended this and subsequent self-reports to forestall allegations.  Trial Ex. 4, E-mail from Ballista to Reger (Feb. 8, 2003).  And as intended, Ryan testified that she read the e-mail and believed that Ballista was acting as a responsible staff member.

Three months later, Ryan received another memo from Ballista to Reger.  Again, he reported rumors about "interaction."  Ballista wrote: "The rumor was brought to my attention from another staff member.  This comes as no surprise to me because of the fact that whenever the floor becomes unhappy with my way of running it, the inmates stir up some rumors."  Trial Ex. 5, E-mail from Ballista to Reger (May 27, 2003).  Again, Ryan believed that these were just rumors about boundaries.

Three or four months after that, Ryan received a Confidential Incident Report from Ballista, again reporting "rumors" -- this time mentioning sexual acts.  Trial Ex. 6, Incident Report, Sept. 17, 2003 ("The above mentioned inmates and myself [including Chao] are being accused of conducting sexual acts.").  Once again, Ryan believed these to be "rumors."  She testified:

> [F]or anyone who's ever worked in a female facility, you spend a good portion of your day trying to whiddle through rumors and innuendos, and she doesn't like me, she looked at me the wrong

-15-

way, so you spend a great deal of time trying to sift out what is and
isn't fact.

She said that IPS looked into the incident, but she decided that no further action was needed.

Ballista filed his fourth decoy report on March 17, 2004.  Trial Ex. 7, Incident Report, Mar. 17,

2004 (blaming Chao's roommate for rumors about Ballista).  Security officers spoke with Chao,

who denied allegations.

Ryan did not authorize a formal investigation until allegations came from a third party.

On March 23, 2004, inmate Cintron told Correction Program Officer Janice Perez that she had

"dirt" on Ballista.  Trial Ex. 9, Confidential Investigation Report.  The next day she was

interviewed by a security officer, Mark Yuille.  She told him that she "kept the peek" while

Ballista had sex with inmate Wanda Rivera ("Rivera") and that Jackson was also having sex with

Rivera.  Trial Ex. 10, Investigative Services Intake Form, Mar. 25, 2004.  This time, Ryan wrote

an urgent matter report and directed the Department of Security to investigate.  She transferred

Cintron to MCI-Framingham pending the investigation.  Trial Ex. 12, Investigation Report, July

28, 2004, at 11.  Ryan assigned Ballista to "the Bubble," a glass-encased guard post position

where she believed he would have little to no access to inmates.  His conduct vis-a-vis Chao,

however, continued; he engaged in sexual acts with her in a nearby bathroom.

This investigation finally confirmed that Jackson had an inappropriate sexual relationship

with Rivera -- the same allegations that had been made a year earlier.  (A formal investigation in

May 2003 had found these allegations to be "unsubstantiated."  Id. at 16.)  Ballista, however,

was cleared.  Although Cintron told investigators that she was in the corridor while Ballista and

Rivera had intercourse in the "Hotel," the investigator found the allegation to be

"unsubstantiated."  Id. at 28.  (Ballista has since admitted to a sexual relationship with Rivera.)
Chao was interviewed and denied having any sexual relationship with Ballista.

Meanwhile, on May 14, 2004, Ryan received an anonymous letter from an inmate at
MCI-Framingham alleging that she had seen Chao perform fellatio on Ballista in the second
floor bucket closet.  Trial Ex. 11, Letter received May 14, 2004.  Ryan wrote another urgent
matter report and initiated an additional investigation.  This investigation took a substantial
amount of time.  It was almost three months before Chao was interviewed again, this time off-
site at Brueggers Restaurant, where she was working.  By now, Internal Affairs was involved
and conducted the interview.  Chao finally disclosed the sexual encounters.  Ballista's
employment was terminated; he was immediately walked off the premises.  He was later
prosecuted and convicted of sexual relations with an inmate.

### D.       Harms of Sexual Misconduct

### 1.       Risks of Sexual Misconduct in Prison

Witnesses on both sides testified emphatically that sexual misconduct in prison has
serious consequences.  Dr. Kotkin reported that there is an inherent imbalance of power between
inmates and guards: "[S]taff really have authority over movement, what rooms you have, what
you can get, sometimes what programs you can apply for, visiting, what is considered to be of
disciplinary infraction and what isn't."  As a result, the relationship between someone who is
incarcerated and the custodian of that person is a different kind of relationship than one you
would find in the general community.  She explained that this imbalance of power is similar to
the way we view children and people with mental health issues.  "The playing field," she
reported, "is not level."  According to Chao, this power dynamic is played out every day.

Because guards had control over the inmates' everyday lives, including visitation with their children, it was especially important to be liked.  If you fell out of favor with one, you fell out of favor with all.

Indeed, in this environment, sex may be exchanged for benefits.  Bowles, who was grateful for Ballista's generosity, thought that he believed that she *owed* him: "You don't say no to someone that's in authority, and besides he had done all these other things for me and I felt okay, is this the reason why he was doing because he expected something in return."

The imbalance of power is exacerbated by the fact that female inmates are especially vulnerable.  Ryan testified that upwards of sixty percent of female inmates are on psychotropic medication.  A disproportionate percentage of women in prison have been victims of domestic or sexual violence.  Indeed, Ryan testified that women tend to be in prison for crimes related to that abuse:

> [T]he pathways, the way they got to jail is a lot different than the way the men ended up there.  With the women, it's a lot of, you know, either they were victims of abuse, or, you know, poverty and they stole things to get money and got caught or their boyfriends are a drug dealer and they were the mule, so the pathways that these women took to get to jail is very different than those of their counterparts on the male side.

In this context, sexual contact with a guard -- whether "consensual" or not -- may cause an inmate to relive the sexual abuse in her past.  Dr. Kotkin explained**:**

> Many women who are incarcerated have been victims of abuse either as children or adolescents or adults, and as a result, the impact of this kind of behavior becomes confusing, can lead to much more serious emotional consequences, can recapitulate abuse in the past so that the relationship in and of itself and that power imbalance may have dire effects for inmates and reconfirm abuse from the past.

-18-

For these reasons, *any* sexual contact between an inmate and a guard is strictly prohibited and deemed "sexual misconduct."  Dennehy testified: "inmates cannot consent, by virtue of their custodial position, they cannot consent, period."  Indeed, as in most states, it is a crime in Massachusetts for a guard to engage in any sexual behavior with an inmate.  Mass. Gen. Laws ch. 268 § 21A.

In addition to the risks of retraumatization, guards' sexual misconduct has other consequences.  When asked about the effects of sexual misconduct in prison, Dennehy answered:

> I probably won't be able to recite a full list.  First and foremost, it creates victims, it can harm the offender, it can potentially violate their rights, secondly it compromises staff, it puts staff in the position where they are then compromised based upon that relationship to the point where contraband may be introduced, special services, privileges may be provided which all undermines the position of the officer.  It brings complete disrespect and dishonor to a profession.  It does undermine the orderly running of the facility.  It creates morale problems among staff.  It creates a sense and a perception of unfairness in the eyes of other offenders when they see offenders receiving privileges that they aren't.  It can result in all kinds of dynamics between offenders who may have knowledge and are pressuring others to keep quiet about it.  The list goes on and on and on, the least of which is illegal, it's illegal.

Similarly, when Ryan was asked whether she would have allowed the sexual encounters to take place had she known earlier, she replied,

> Absolutely not. . . . No. 1, it's illegal.  No. 2, as a woman you wouldn't want -- what woman would want to see any other woman put in that place. . . It completely destroys the security of a correctional facility, the whole balance is thrown off, it discredits, you know, very honest people, people who would never engage in behavior like this, it ruins credibility with our outside folks, stake holders, what positive can possibly come out of it?  It also, I mean,

-19-

you're victimizing women who have probably already been
victimized in their life.

**2.     Harm to Chao**

As for Chao herself, she testified that she is just beginning to understand the harm that

this "relationship" has caused her:

> Q.     Can you tell me this, can you tell the jury this, how were you
>         harmed by the defendants?
> A.      Numerous ways.  I mean, some ways I don't think I fully
>         understand, other ways, you know, I was already at a low point in
>         my life.  My self-esteem was taken from me, my dignity, my
>         self-worth just gone.  I have emotional problems, I have trust
>         issues, and not only does it, you know, it affects me, but it also
>         affects how I compare with my children, how can I teach them to
>         have these values that are so low for me because a lot has been
>         taken from me.  How do I teach them to be high self-esteem, high
>         self-morals, especially my daughter when I don't have them
>         myself.  I'm trying to build them up piece by piece from what has
>         been taken from me, not voluntary given.

Plaintiff's mental health expert, Dr. Stuart Grassian ("Dr. Grassian"), opined that

although Chao has had other experiences of abuse in her life, the relationship with Ballista

further entrenched her in the cycle of violence.  Indeed, it is at the "core" of her shame, guilt

and isolation.  Psych. Eval. at 8.  She has now lost all trust and has lost the capacity to relate to

others; she is entirely isolated.

## II.    SUFFICIENCY OF THE EVIDENCE

### A.     Standards

Ballista and Ryan have independently moved for a judgment as a matter of law

notwithstanding the verdict or, in the alternative, a new trial.  They bring their post-trial motions

under Fed. R. Civ. P. 50 and 59.  Rule 50(b) allows a court to grant a motion for judgment as a

matter of law if the court determines that "a reasonable jury would not have a legally sufficient

evidentiary basis to find for the party on that issue."  Rule 59 allows the court wider latitude: A

court may grant a motion for a new trial "for any reason for which a new trial has heretofore

been granted in an action at law in federal court."

In either case, a party seeking to overturn -- or set aside -- a jury verdict faces an "uphill

battle."  Marcano Rivera v. Turabo Med. Ctr. P'ship, 415 F.3d 162, 167 (1st Cir. 2005).  "Courts

may only grant a judgment contravening a jury's determination when the evidence points so

strongly and overwhelmingly in favor of the moving party that no reasonable jury could have

returned a verdict adverse to that party."  Rivera Castillo v. Autokirey, Inc., 379 F.3d 4, 9 (1st

Cir. 2004) (internal quotation marks and citation omitted).  The evidence at this stage of the

litigation must be viewed in the light most favorable to the verdict.  Raiche, 623 F.3d at 35.

And the court is to reconcile any inconsistencies in the verdict to the extent possible.  Id.

## B.    Discussion

In the case at bar, Ballista and Ryan argue that the jury's verdict is inconsistent and

should be set aside in part or in its entirety.  Since the jury found no assault and battery, they

argue, the jury must have found that Chao consented to the individual sexual encounters.  Such

encounters, they insist, do not rise to the level of a violation of the Eighth Amendment.

Moreover, Ballista argues that if the sexual encounters were consensual, then he cannot be

liable for intentional infliction of emotional distress.  Ryan in turn argues that because the jury

found that her conduct was not "deliberate, willful, wanton or malicious," she cannot have been

"deliberately indifferent" to Chao under the Eighth Amendment.

I will address the sufficiency of the evidence -- and the allegations of an inconsistent

verdict -- by claim.  First, I will address the Eighth Amendment verdicts against Ryan and

Ballista, and then I will turn to Massachusetts Civil Rights Act ("MCRA") and the intentional

infliction of emotional distress verdicts against Ballista.

### 1.      Eighth Amendment

The jury found that Ballista violated Chao's constitutional right to be free from sexual

abuse and that Ryan failed to protect her from his exploits.  As I explain below, these verdicts

are supported by substantial evidence.

To prevail on a § 1983 claim against a state official under the Eighth Amendment, a

plaintiff must show that (1) the alleged conduct is "objectively, sufficiently serious" so as to

constitute the unnecessary and wanton infliction of pain, and (2) that the prison official was

"deliberate[ly] indifferen[t] to inmate health or safety" and had a "sufficiently culpable state of

mind."  See Farmer v. Brennan, 511 U.S. 825, 834 (1994).  I will consider each prong in turn.[4]

### a.      Sufficiently Serious Harm

It is well established that sexual abuse by a prison guard may give rise to an Eighth

Amendment claim.  See, e.g., Daskalea v. District of Columbia, 227 F.3d 433 (D.C. Cir. 2000);

Boxer v. Harris, 437 F.3d 1107, 1111 (11th Cir. 2006); Freitas v. Ault, 109 F.3d 1335, 1338

(8th Cir. 1997); Boddie v. Schnieder, 105 F.3d 857, 860–61 (2d Cir. 1997); Women Prisoners v.

District of Columbia, 877 F. Supp. 634, 665 (D.D.C. 1994), rev'd on other grounds by Women

Prisoners v. District of Columbia, 93 F.3d 910 (D.C. Cir.1996).  Sexual abuse is simply not a

legitimate part of an inmate's punishment for her crime.  See Farmer, 511 U.S. at 833–34.

---

[4] Of course to prevail on a claim against a state officer who claims qualified immunity, a plaintiff must show not only that her constitutional right was violated, but also that that right was clearly established at the time of the events in question.  Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled on other grounds.  I will turn to that question in Part III, infra.  Here, I address the threshold question of whether her constitutional right was violated.

Whether or not sexual abuse rises to the level of "unnecessary and wanton infliction of pain," however, will depend on the circumstances of the case at hand. Boddie, 105 F.3d at 861-62. As I noted at summary judgment, even consensual sex between a guard and an inmate *may* rise to the level of serious harm required by the Eighth Amendment, depending on the facts of a case. Chao, 2011 WL 1097416, at *12 ("Again, let me be clear: I do not find as a matter of law that any intercourse or oral sex violates the Eighth Amendment. But neither do I find that voluntary sex may never violate the Eighth Amendment. A sexual relationship between an inmate and a guard may rise to the level of harm required for an Eighth Amendment claim. Sex and coercive relationships are complicated and the level of harm -- or lack thereof -- will depend on the facts of a given case."). That preliminary holding has only been bolstered by the testimony in this trial -- testimony by witnesses on both sides.

*Any* sexual contact between a guard and an inmate is considered sexual misconduct, a form of sexual abuse. See Bureau of Justice Statistics, U.S. Dept. of Justice, Survey on Sexual Violence, State Prison Systems 2, 5 (2004) (defining staff sexual misconduct as consensual or non-consensual sexual acts). As in most states, it is a crime in Massachusetts to have sexual relations with an inmate. Mass. Gen. Laws ch. 268 § 21A. Dennehy explained that "inmates cannot consent, by virtue of their custodial position, they cannot consent, period."

Still, while all parties agreed that sexual misconduct -- and even the sexual misconduct in this case -- is deplorable, the question before the jury was whether the misconduct rose to the level of "sufficiently serious harm." Consent is unquestionably relevant to that inquiry -- but it is not dispositive. I explained to the jury:

> Sexual misconduct of a guard towards a prisoner may rise to the
> level of sufficiently serious harm depending on the circumstances

of the case.  As I said when we began the trial, in order to
determine whether the misconduct rose to that level, you may
consider all of the circumstances surrounding the sexual
encounters, including the words and actions of Mr. Ballista, the
words and actions of Ms. Chao, the fact that the setting is a prison,
the nature of their sexual encounters, benefits or threats given or
received, etc.

I remind you that although Mr. Ballista was criminally convicted
under Massachusetts law for engaging in sexual relations with Ms.
Chao, a violation of that criminal statute does not equate to a
violation of the Eighth Amendment.   It is for you to decide
whether the specific conduct to which he admitted amounted to an
Eighth Amendment violation.

The parties have raised the issue of consent, whether Ms. Chao's
conduct amounted to consent to Mr. Ballista's acts.  Consent is not
an absolute defense to a claim for sexual abuse under the Eighth
Amendment, but it is obviously relevant to an Eighth Amendment
violation.  It is one of the circumstances that you are to consider in
evaluating whether the conduct at issue was sufficiently serious.

Jury Instructions at 4 (document #165).  In finding for the plaintiff against Ballista and Ryan,

the jury necessarily found the harm *in this case*, *in these circumstances* to be sufficiently

serious.

There was substantial evidence to suggest that the relationship between Chao and

Ballista was coercive.  She acquiesced to the sexual encounters because she felt that she had to.

Although at some point she had feelings for Ballista, there came a time when she felt that she

was being "used."  She testified, "I wanted it to end.  I did not know how to stop it. . . . I wanted

it to end because it was very clear to me I was being used."  She explained that the very nature

of their sexual encounters was degrading:

I wanted it to end because it was very clear to me I was being
used.  Like I said, it was only maybe five times that we had
intercourse out of over 100 times that I gave him oral sex.  There's

-24-

nothing -- that's not a relationship, that's being used.  It's being
degraded.  It's dirty.  It's not what I wanted.

During the same time period, Ballista had sexual encounters with at least four other inmates.

Although the individual sexual encounters may have been "consensual" -- meaning that the

inmate did not outright refuse -- the jury could have come to the conclusion that these

"relationships" were coercive.  Even Ballista recognized that he knew he was abusing his power

and "taking advantage."

To be sure, the pain caused by sexual misconduct is not necessarily the same type of

physical harm as from beating or excessive force.  But it is no less serious, and indeed, in some

ways, may be even more harmful.  Sexual misconduct of guards may cause "significant

depression, nausea, frequent headaches, insomnia, fatigue, anxiety, irritability, nervousness, and

a loss of self-esteem," and these effects are "more than enough evidence to satisfy the objective

component of the Eighth Amendment."  Women Prisoners, 877 F. Supp. at 665, rev'd on other

grounds.

Both parties' witnesses testified about the risks of re-victimization of inmates who have

already experienced trauma in their lives.  Ryan discussed the histories of the inmates at SMCC

and emphasized that she works with staff to avoid re-traumatizing them.  Dr. Kotkin testified

that for these inmates, "the impact of [sexual misconduct] becomes confusing, can lead to much

more serious emotional consequences, can recapitulate abuse in the past so that the relationship

in and of itself and that power imbalance may have dire effects for inmates and reconfirm abuse

from the past."

In fact, the jury may well have credited Dr. Grassian's report that Chao has suffered

extraordinary psychological harm from the abuse:  "In my interview with her, Cristina stated

that the Ballista situation remains at the core of her shame, guilt, and fear.  Given her utter

powerlessness to escape the situation, the shame guilt, isolation, and constant hostility she faced

in that trapped prison setting, her statement makes perfect sense."  Psych. Eval. at 9.  Dr.

Grassian situated the harm from Ballista within the narrative of abuse in her life.  He writes,

"[T]he Ballista situation has severely diminished the chance that she can escape this cycle of

isolation, desperation to be loved, and then enduring abuse."  Id.

### b.        Deliberate Indifference

As the instructions outlined, it is not enough that the plaintiff sustained serious harm.

To reach a verdict for a violation of the Eighth Amendment, the jury must have also found that

Ballista and Ryan were each sufficiently culpable, or deliberately indifferent to the rights,

health or safety of a person in Chao's position.  Farmer, 511 U.S. at 834.  They need not have

known of the actual harm to the plaintiff; it is sufficient that they were aware of a substantial

*risk* of serious harm and failed to respond reasonably to that risk.  Id. at 842.  See also Burell v.

Hampshire, 307 F.3d 1, 8 (1st Cir. 2002) ("[E]ven if they are aware, they cannot be deliberately

indifferent if they responded reasonably to the risk, even if the harm ultimately was not

avoided.").

### (1)       Ballista

The case against Ballista could not have been more straightforward.  Over the course of

almost a year, he had Chao perform fellatio fifty to one hundred times, sometimes three times in

one night.  He confessed to her that he was abusing his authority and taking advantage of her.

He knew of her personal background, and yet he engaged in this conduct anyway.  In addition

to being reckless with her mental health, he was also reckless with her physical health.  He used plastic gloves or bags as "protection" when they had intercourse.

Indeed, it appeared that it became a game for him, with multiple inmates and sexual encounters in at least twenty-three different places in this small facility.  He wrote "reports" about rumors as a decoy so as to avoid detection.

The evidence at trial was overwhelming; Ballista knew of the risk of harm and was intentionally and deliberately indifferent to it.

### (2)    Ryan

Proving deliberate indifference against a supervisory official, however, requires additional steps.  Here, Chao's claim against Ryan (and Dennehy) was that they failed to protect her from Ballista's harm.  I explained to the jury:

> Ms. Chao must show not only that she was incarcerated under conditions that posed a substantial risk of serious harm, but also that the officials were actually *aware* of that substantial risk of serious harm.  The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and she must also draw that inference.  The knowledge element of deliberate indifference is subjective, not objective, meaning that the official must actually be aware of the existence of the excessive risk.  It is not sufficient that the official should have been aware.

Jury Instructions at 4-5.  See also Farmer, 511 U.S. at 837.  Still, even if the defendant is subjectively aware of the risk, she will not be liable if she responded reasonably to that risk. Burell, 307 F.3d at 8.

Ryan became superintendent of SMCC at a time when the prison was in flux.  She oversaw the transition from a male to a female institution.  She had attended and even conducted "female offender training."  Based on that experience, the jury may have reasonably

concluded that she well knew of the risks of sexual misconduct by guards.  She testified that she installed a single camera outside the SMCC, she added windows to the doors, and she hung curtains in the bathrooms.  The prison instituted a three-day period of "female offender training" for the staff.  The jury may have come to the conclusion, however, that this was not remotely enough to deal with the dangers the women faced.

During the trial, Ryan gave a virtual tour of the facility by video.  She pointed out that the surveillance cameras -- that are now installed in virtually every hallway -- were not in place at the time of the events in question.  The jury may have drawn the inference that surveillance cameras are crucial to protecting female inmates' safety, particularly with a mostly male staff. They may have concluded that this fact is so obvious that Ryan knew it to be true, as she eventually did install cameras.  The jury also heard testimony that a single male officer was regularly staffed on a floor at night with female inmates in rooms with unlocked doors.  Again, the jury may have drawn the inference that such conditions were unsafe for female inmates, and, further, that Ryan was aware of the risks.

Indeed, in the case at bar, Ryan was not only aware of prison conditions that posed a substantial risk of serious harm, she was actually *told* of allegations of prison misconduct as early as February 2003, more than a year before Ballista was terminated.  During her tenure, at least two guards had sexual contact with at least five inmates in at least twenty-three locations throughout the small institution.  The two guards reported "rumors" of their own conduct. According to prison policy, Ryan should have investigated these allegations.[5]  Instead, she

---

[5]According to Department of Correction policy, "All allegations and incidents of sexual contact or sexual abuse by employees, contractors or volunteers with inmates must be reported, fully investigated and treated in a confidential and serious manner."  Trial Ex. 36, Mass. Dep't of Correction, Office of Investigations, Staff Sexual Misconduct with Inmates 103 DOC 519, 519.01.  Allegations are defined as "Any event that is said to have

apparently dismissed the claims, chalking them up to the types of rumors one typically hears in a female facility:

> [F]or anyone who's ever worked in a female facility, you spend a good portion of your day trying to whiddle through rumors and innuendos, and she doesn't like me, she looked at me the wrong way, so you spend a great deal of time trying to sift out what is and isn't fact.

Indeed, it was not until March 2004, when Cintron provided an eyewitness account of sexual misconduct, that Ryan authorized a formal investigation (and sent Cintron to Framingham "pending investigation").  Cintron's account was ultimately deemed "unsubstantiated" by the investigator who reported to Ryan; she was then returned to SMCC.

To be sure, as I noted at summary judgment, there were two plausible stories here. Chao, 2011 WL 1097416, at *18.  Ryan claimed that she did everything that she could, that she understood the dangers of sexual misconduct, and that she reacted in the most professional manner to the allegations as she became aware of them.  But there was another side, well supported by the evidence.  This was an institution that had only recently become a women's institution.  What Ryan may have ultimately wanted for the institution had not yet been done before women were allowed to reside there.  In this interim, it was plagued with what could only be described as sexual chaos: sexual encounters by guards with multiple inmates, apparently taking place with impunity, where inmates, who were relishing the comparative freedom of the institution, were scared of reporting misconduct for fear of being "shipped" to Framingham.  Male officers were allowed by Ryan to patrol unsupervised; surveillance cameras had not been installed.  And rather than being particularly attentive to allegations that the male

_____

happened but which has not yet been verified.  These events include rumor and 'inmate talk.'" Id. at 519.02.

-29-

staff, used to a male population, had sexual contact with inmates, Ryan dismissed eyewitness

accounts of sexual misconduct as "rumors."  The jury's conclusion that Ryan was aware of the

risks of serious harm, and that she failed to respond reasonably to those risks -- was supported

by substantial evidence.[6]

Ryan argues that because the jury found no punitive damages -- as in that her conduct

was not "willful, wanton, or malicious" -- they could not have found that she was "sufficiently

culpable" as to have been deliberately indifferent.  Again, the jury's verdicts are perfectly

consistent.  There was no evidence that Ryan *wished* or *intended* Chao -- or the other female

inmates -- to be harmed.  Unlike Ballista, Ryan was not malicious so as to be subject to punitive

damages.  But malicious conduct is not required to sustain an Eighth Amendment claim for

supervisory liability.  Indeed, such a requirement would vitiate altogether Eighth Amendment

claims for failure to protect.  Rather, in Farmer, the Court held that a claim under the Eighth

Amendment requires something more than negligence but something less than intentional harm.

See Farmer, 511 U.S. at 835 ("While Estelle establishes that deliberate indifference entails

something more than mere negligence, the cases are also clear that it is satisfied by something

less than acts or omissions for the very purpose of causing harm or with knowledge that harm

---

[6] Ryan argues that the court erred by refusing to provide separate damages awards for each defendant.  I have addressed and rejected this argument before.  As I explained in my Order Re: Assessment of Interest, May 5, 2011 (document #181), § 1983 is a "species of tort liability." Carey v. Piphus, 435 U.S. 247, 253 (1978).  In tort, a plaintiff is awarded damages according to the injury that she suffered.  Where that injury is indivisible, the defendants are joint and severally liable for the harm -- even where they did not act in concert.  Bigelow v. Old Dominion Cooper Mining & Smelting Co., 225 U.S. 111, 128 (1912); Schell v. Birnhaum, 1994 WL 878922, at *8 (Mass. Super. Nov. 28, 1994).  Here, Ryan argues that she should not be liable for any harm that arose before the first report that she received alleging sexual misconduct.  She contends that the jury should have been asked to apportion damages accordingly.  Again, the argument is unavailing.  The harms from sexual misconduct -- repeated over the course of a year -- cannot be so easily divided by incident.  It would defy common sense to ask the jury to determine how much each sexual encounter was "worth" in terms of damages.  The harms of sexual abuse are long-lasting, and indeed, Chao will continue to experience pain for years to come.  Moreover, even if Chao's harm *could* be divided by incident, Ryan was responsible for the prison conditions that failed to protect Chao from the moment she stepped foot on the property: the lack of cameras and patrol assignments.

will result.") (citing <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976)).  Between negligence and intentional harm lies *recklessness*.  <u>Farmer</u>, 511 U.S. at 839 (adopting the standard of "subjective recklessness" as used in the criminal law).  And it is fair to say that the jury, supported by substantial evidence, found Ryan's conduct to be reckless.

In sum, the jury's verdict with regard to Chao's Eighth Amendment claims is **AFFIRMED** as against both Ballista and Ryan.

### 2.    MCRA Claim

Next, Ballista challenges the jury's verdict that the MCRA was violated.  I gave the following instructions to the jury:

> To establish a claim under the Massachusetts Civil Rights Act, a plaintiff must show that:
>
> > (1) their exercise of enjoyment of rights secured by the Constitution or the laws of either the United States or the Commonwealth;
> >
> > (2) have been interfered with or attempted to be interfered with; and
> >
> > (3) that the interference or attempted interference was by threats, intimidation or coercion.
>
> A "threat" is the intentional exertion of pressure to make another fearful or apprehensive of injury or harm.
>
> "Intimidation" is putting one in fear for the purpose of compelling or deterring conduct.
>
> "Coercion" is the application to another of such force, either physical or moral, as to constrain her to do against her will something she would not otherwise have done or the active domination of another's will.
>
> Should you find that Mr. Ballista's conduct constituted threats, intimidation or coercion that violated Ms. Chao's right to be free

> from cruel and unusual punishment or her right to bodily
> integrity, then you must find a violation of the Massachusetts
> Civil Rights Act by defendant Ballista.

Jury Instructions at 7.  See also Mass. Gen. Laws ch. 12 § 11H-I.

The analysis is similar to the Eighth Amendment inquiry, except that the MCRA requires "threats, intimidation, or coercion."  Here, Ballista argues that if we can infer that the jury found consent -- because it found no assault and battery -- then we must conclude that it could not have found intimidation or coercion.  The evidence, however, belies this argument. The jury may reasonably have found that Ballista's conduct was not formally assault and battery because Chao did acquiesce to the encounters but that it was nevertheless coercive within the meaning of the MCRA.

Chao testified that she could not say no.  She acquiesced to the sexual encounters because this was a place where you did what you were told:  "If you [were] told to do something, you did it, regardless, if I was told to sweep the floor, I swept the floor. . . . I did what I was told to do."  There was an implied quid pro quo arrangement in their encounters. Ballista kept her contraband, told her when they were going to "toss" her room, and ensured that she could call her children.  The jury could easily have concluded that implicit in these benefits was a threat: just as benefits could be given, so could they be taken away, or worse.

Such an exchange is inherently coercive.  Indeed, Ballista seemed to have used his authority to lure inmates.  Bowles testified that Ballista started flirting with her by getting her mail, making sure that she got what she needed.  He would let her mother and sister bring food and personal belongings.  She too performed fellatio on him "because he told [her] to."  She testified that she "grew up in the system" and "you don't say no to someone that's in authority."

-32-

She felt like he believed that she somehow owed it to him: "he had done all these other things for me and I felt okay, is this the reason why he was doing because he expected something in return."

In light of the testimony about the nature of relationships between inmates and guards in prison, Ballista's relationships with other inmates, as well as the particular relationship between Ballista and Chao, the jury's conclusion was entirely supportable -- that Ballista, through intimidation or coercion, interfered with Chao's rights to protection and to be free from abuse. The verdict in favor of Chao for the violation of the MCRA is **AFFIRMED**.

### 3.      Intentional Infliction of Emotional Distress

Finally, Ballista challenges the verdict for intentional infliction of emotional distress.  I explained to the jury that to prevail on a claim for intentional infliction of emotional distress, the plaintiff must prove:

> (1) that the defendant intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of his conduct;
>
> (2) that the defendant's conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community;
>
> (3) the actions of the defendant were the cause of the plaintiff's distress; and
>
> (4) the emotional distress suffered by the plaintiff was severe and of such a nature that no reasonable person could be expected to endure it.

Jury Instructions at 10.  See also Payton v. Abbott Labs, 386 Mass. 540, 555 (1982).

Here, there was sufficient evidence to suggest that Ballista knew, or should have known, that emotional distress would result from his conduct.  Indeed, he admitted to Chao that he

worried that he was "taking advantage" of her, that he was abusing his authority.  He knew that she had suffered from sexual abuse in her past, and the jury could reasonably have concluded that he should have known that these encounters would result in emotional harm.

And in fact, the jury could have concluded that his conduct -- demanding fellatio in twenty-three separate places with an inmate in a correctional institution -- was extreme and outrageous.  It is true, as Ballista points out, that intentional infliction of emotional distress requires more than "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities," Foley v. Polaroid Corp., 400 Mass. 82, 99 (1987) (internal quotation and citation omitted), but the evidence in this case suggested that sexual misconduct -- even arguably "consensual" sexual encounters -- is not a "triviality."  Dennehy testified that the harms of sexual misconduct are so numerous that she could not recite a full list.  Ryan in turn said that sexual misconduct "destroys the security of a correctional facility" and "victimiz[es] women who have probably already been victimized in their life."  Finally, Dr. Grassian testified that Ballista's conduct caused Chao severe emotional distress, further entrenching her in a cycle of abuse and powerlessness.  The jury reasonably came to the conclusion that the distress of a person engaging in sexual encounters over a long period of time with her captor is such that no reasonable person should be expected to endure it.

The verdict in favor of Chao against Ballista for the intentional infliction of emotional distress is **AFFIRMED.**

## III.   QUALIFIED IMMUNITY

I have concluded that the jury's verdict is consistent and supported by the evidence for each of the claims for which the plaintiff prevailed.  Chao has proven that Ballista is liable for

the violation of the MCRA and intentional infliction of emotional distress, and that both Ryan and Ballista violated her Eighth Amendment right to protection.  Ryan, however, claims that she is entitled to qualified immunity because, at the time of the events in question, it was not "clearly established" that her conduct was unlawful.  Indeed, an officer who violates a constitutional right will be entitled to qualified immunity if her actions did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The First Circuit has articulated that this "clearly established" inquiry has two aspects: (a) the clarity of the law in question; and (b) the clarity of the law as applied to the factual context -- or whether a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights in this instance. Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009).

Throughout, the principal inquiry is whether the official was *on notice* that her conduct was unlawful.  Saucier, 533 U.S. at 206.  "The unconstitutionality of outrageous conduct obviously will be unconstitutional, this being the reason, as Judge Posner has said, that '[t]he easiest cases don't even arise.'"  Safford United Sch. Dist. No. 1 v. Redding, 129 S. Ct. 2633, 2643 (2009) (quoting K.H. v. Morgan, 914 F.2d 846, 851 (7th Cir. 1990)).  The purpose of qualified immunity is to protect officers who perform their job in good faith and may be mistaken as to the requirements of the law in a given circumstance.  Pearson v. Callahan, 555 U.S. 223, 231 (2009).

The question of whether a right is "clearly established" generally arises at the boundaries of new legal territory.  In that context, an officer may be mistaken as to whether

there is probable cause to conduct a search in the particular factual context that he confronts.[7]

Or an officer may be mistaken as to whether the circumstances warrant his use of force. <u>See</u>

<u>Saucier</u>, 533 U.S. at 205 ("It is sometimes difficult for an officer to determine how the relevant

legal doctrine, here excessive force, will apply to the factual situation the officer confronts."),

<u>overruled on other grounds</u>. These decisions are made in a split second; qualified immunity

seeks to protect officers who perform their duties in legally gray areas.

Ryan contends that this is such a case. She points to cases where judges held -- as a

matter of law -- that consensual sexual contact between an inmate and a guard may not rise to

the level of an Eighth Amendment violation. <u>Freitas v. Ault</u>, 109 F.3d 1335, 1339 (8th Cir.

1997) ("[W]e hold that, at the very least, welcome and voluntary sexual interactions, no matter

how inappropriate, cannot as matter of law constitute 'pain' as contemplated by the Eighth

Amendment."); <u>Hall v. Beavin</u>, No. 98-3803, 1999 WL 1045694, slip op. at *1 (6th Cir. Nov. 8,

1999); <u>McGregor v. Jarvis</u>, No. 9:08-770, 2010 WL 3724133, slip op. at *11 (N.D.N.Y. Aug.

20, 2011); <u>Phillips v. Bird</u>, No. 03-247, 2003 WL 22953175, slip op. at *6 (D. Del. Dec. 1,

2003); <u>Fisher v. Goord</u>, 981 F. Supp. 140, 174 (W.D.N.Y. 1997). That I disagreed in my

decision on summary judgment, she argues, is only evidence that the law is unclear. <u>See</u>

<u>generally</u> <u>Chao</u>, 2011 WL 1097416.

---

[7] For example, the Supreme Court recently held that a public school official who conducted an illegal search of a student was entitled to qualified immunity because the contours of a student's right to privacy at school was not clearly established at the time of the search. <u>Safford</u>, 129 S. Ct. at 2644 ("We would not suggest that entitlement to qualified immunity is the guaranteed product of disuniform views of the law in the other federal, or state, courts, and the fact that a single judge, or even a group of judges, disagrees about the contours of a right does not automatically render the law unclear if we have been clear. That said, however, the cases viewing school strip searches differently from the way we see them are numerous enough, with well-reasoned majority and dissenting opinions, to counsel doubt that we were sufficiently clear in the prior statement of law.").

Ryan, however, misconstrues the right at issue.  She is charged with violating Chao's right to *protection*, and that right is unquestionably well-established.  Ortiz v. Jordan, 131 S. Ct. 884, 892-93 (2011).  A prison official may be held liable for deliberate indifference to a prisoner's Eighth Amendment right to protection where she knows that an inmate faces a substantial risk of harm and she disregards the risk by failing to take reasonable measures to abate it.  Farmer, 511 U.S. at 834, 847.  Prison officials have the duty to protect their inmates by training and supervising guards, creating and sustaining a safe prison environment, and investigating allegations of sexual misconduct or abuse when they arise.  The degree of force (or lack of "consent") of the sexual contact that eventually transpires is irrelevant to the question of whether the right to protection from sexual abuse is clearly established under law.[8]

Indeed, the pre-existing law with respect to the inmate's right to protection from sexual misconduct and the officer's obligation to protect an inmate is not in controversy.  To the extent that there is any controversy here -- and I conclude there is not -- it is whether the official's conduct -- their acts or failures to act -- crossed a constitutional line.  And that question will depend on the particular facts of the case.  The Supreme Court recently articulated this distinction in Ortiz, where a former inmate in an Ohio reformatory brought a civil rights action under § 1983 for a judgment for damages against superintending prison officers who failed to

---

[8] Ryan has never contended that she does not have the duty to protect inmates from sexual abuse -- nor does she suggest that inmates do not have the right to protection from sexual contact by guards, consensual or not.  To the contrary, she testified at length that all sexual contact is sexual misconduct, that it is against the law, and that she takes it seriously.  This is not a case where an official may have been legitimately confused about the extent of an inmate's privacy rights.  See Schwenk v. Hartford, 204 F.3d 1187, 1197 (9th Cir. 2000) ("In the simplest and most absolute terms, the Eighth Amendment right of prisoners to be free from sexual abuse was unquestionably clearly established . . . and no reasonable prison guard [or prison official] could possibly have believed otherwise.").

protect her from sexual contact by a corrections officer.  131 S. Ct. at 888, 893.  The Court

determined that the question of qualified immunity in this context was not a pure legal question:

> [T]he pre-existing law was not in controversy.  See Farmer v.
> Brennan, 511 U.S. 825, 834, 847, 114 S. Ct. 1970, 128 L.Ed.2d
> 811 (1994) (prison official may be held liable for "deliberate
> indifference" to a prisoner's Eighth Amendment right to protection
> against violence while in custody if the official "knows that [the]
> inmat[e] face[s] a substantial risk of serious harm and disregards
> that risk by failing to take reasonable measures to abate it"
> (internal quotation marks omitted)); Crawford-El v. Britton, 523
> U.S. 574, 592, 118 S. Ct. 1584, 140 L.Ed.2d 759 (1998) (First
> Amendment shields prisoners from "retaliation for protected
> speech").  What was controverted, instead, were the facts that
> could render Jordan and Bright answerable for crossing a
> constitutional line. Disputed facts relevant to resolving the
> officials' immunity pleas included: Was Jordan adequately
> informed, after the first assault, of the identity of the assailant and
> of Ortiz's fear of a further assault?  What, if anything, could Jordan
> have done to distance Ortiz from the assailant, thereby insulating
> her against a second assault?  Did Bright place and retain Ortiz in
> solitary confinement as a retaliatory measure or as a control
> needed to safeguard the integrity of the investigation?

Id. at 892-93 (internal citation and footnote omitted).

Likewise, here too Ryan's claim for qualified immunity turns on the factual context --

whether a reasonable official would have understood that her actions violated Chao's clearly

established right to protection.  Maldonado, 568 F.3d at 269.  In other words, the court asks

whether the law is clear *as applied to these facts*, a question for the court to decide.  Raiche, 623

F.3d at 35, 36 ("In the end, the availability of qualified immunity after a trial is a legal question

informed by the jury's findings of fact, but ultimately committed to the court's judgment.")

(internal quotation and citation omitted).

Considering the evidence in the light most favorable to the verdict, there is no doubt that

a reasonable officer in Ryan's position would have understood what the law required of her as a

warden of a women's prison during a major transition.  A reasonable officer would have known that the conditions at SMCC placed female inmates at significant risk of serious harm.  There was not a single surveillance camera inside the premises; the officers' watch schedules placed an unsupervised male officer on a floor of sleeping women in rooms to which he had access.  Moreover, a reasonable warden would have known that the law required her to investigate the allegations of Jackson or Ballista's sexual misconduct when they first arose.  While institutions may swirl with rumors about this or that, this institution was in a unique position -- a place of relatively lenient rules, only recently transformed into a women's prison, guarded largely by men who were new to the responsibilities of protecting a female inmate.  A reasonable warden would not have "shipped" inmates who reported abuse to another facility while merely placing the accused offender in "the bubble" where he had continued access to female inmates.

Because the constitutional right to protection was clearly established both generally and as applied to these facts, Ryan is not entitled to qualified immunity.

## IV.  <u>CONCLUSION</u>

For the reasons stated above, Ryan and Ballista's Motions for Judgment as a Matter of Law or New Trial  (**document ## 186, 190**) are **DENIED**.


**SO ORDERED.**

**Date:  July 28, 2011**          _/s/ Nancy Gertner_
                                  **NANCY GERTNER, U.S.D.J.**